UNITED STATES of America, Plaintiff,

v.

FIRST NATIONAL STATE BANCORPO-
RATION, First National State Bank of
Central Jersey and First National Bank
of South Jersey, Defendants,

and

John G. Heinmann, Comptroller of the
Currency, Intervenor.

Civ. A. No. 79–1785.

United States District Court,
D. New Jersey.

July 23, 1980.

Robert E. Hauberg, Jr., Thomas L. Greaney, Bruce P. White, Constance K. Robinson, David L. Lapides and Rebecca P. Dick, Antitrust Div., Dept. of Justice, Washington, D. C., for plaintiff.

Eugene J. Metzger, Michael E. Friedlander, Metzger, Shadyac & Schwarz, Washington, D. C., and Frederic K. Becker, Wilentz, Goldman & Spitzer, Woodbridge, N. J., for defendants.

Harold F. Baker, John DeQ. Briggs, III, William J. Hunter, Howrey & Simon, and John M. Miller, Charles H. McEnerney, Jr., Thomas P. Vartanian, Office of the Comptroller of the Currency, Washington, D. C., for intervenor.

## OPINION

GERRY, District Judge.

### I.

### INTRODUCTION

The United States of America, plaintiff, by its attorneys, acting under the direction of the Attorney General of the United States instituted this action by the filing of a complaint on June 6, 1979 to prevent and restrain an alleged violation by defendants of Section 7 of the Clayton Act (the "Act"), 15 U.S.C. § 18.[1] The court has jurisdiction over the parties, and it has jurisdiction over the subject matter of the complaint pursuant to Section 15 of the Act, 15 U.S.C. § 25. Venue in the District of New Jersey is proper. 28 U.S.C. § 1391(b)–(c). All of the defendants are engaged in interstate commerce.

### II.

### FACTUAL BACKGROUND

#### A.  PARTIES

Defendant First National State Bancorporation ("Bancorporation") is a registered bank holding company organized under the laws of New Jersey, with its principal place of business in Newark, Essex County, New Jersey. It principally owns and supervises six subsidiary banks which operate a general commercial banking business in the State of New Jersey. Bancorporation offers a broad range of lending, depository and related financial services to commercial, industrial, financial, governmental and individual customers. As of June, 1979, Bancorporation was the largest commercial banking organization with commercial banking offices within New Jersey, as measured by deposits.[2]

One of Bancorporation's subsidiaries, First National State Bank of Central Jersey ("FNSB–Central") is also a defendant in this action. FNSB–Central is a national banking association organized and existing under the laws of the United States. It maintains its principal place of business in Trenton, Mercer County, New Jersey and operates a general commercial banking business within that state.

Defendant First National Bank of South Jersey ("South") is a national banking association, organized under the laws of the United States with its principal place of business in Atlantic County, New Jersey. As of June, 1979, South was the sixteenth largest commercial banking organization, as measured by deposits, with commercial banking offices within the state.

#### B.  PROCEEDINGS

In January, 1978, defendants entered into a formal agreement providing for the merger of South and FNSB–Central, under the charter of the latter, and with the title of First National State Bank of South Jersey.[3]

---

1. While plaintiff purports to base this action upon the Clayton Act, the court must judge the legality of defendants' conduct under the standards of the Bank Merger Act of 1966 (Act of Congress of February 21, 1966, P.L. 89–356, 80 Stat. 7, amending Section 18(c) of the Federal Deposit Insurance Act, 12 U.S.C. § 1828(c)) which directs the court to determine: (1) whether the proposed merger transaction in any section of the country may be substantially to lessen competition; and (2) whether the anti–competitive effects of the proposed transaction are clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served. See 12 U.S.C. § 1828(c)(5)(B); 12 U.S.C. § 1828(c)(7)(B).

2. Measured by earnings, Midlantic Bank was the largest. Schoen, Tr. 2153-4. Measured by capital, Fidelity Union Bank was the largest. Cartmell, Tr. 2236. United Jersey Bank had the most banking offices within the state. Baxter, Tr. 3771-2.

3. The discussions between Bancorporation and South apparently began during the summer of 1977. Kirkman, Tr. 1756. The two banking organizations signed a letter of intent to merge on August 31, 1977. Government Exhibit

The defendants filed a merger application with the Comptroller of the Currency ("Comptroller") and, pursuant to the Bank Merger Act of 1966, 12 U.S.C. § 1828(c)(4), copies of the application were submitted to the Board of Governors of the Federal Reserve System ("Federal Reserve Board"), the Federal Deposit Insurance Corporation ("FDIC"), and the Antitrust Division of the United States Department of Justice for reports on the competitive factors involved.[4] The Federal Reserve Board reported to the Comptroller that the proposed merger "would have adverse effects on competition."[5] The FDIC and the Antitrust Division reached similar conclusions.[6]

On September 22, 1978, Bancorporation and South filed with the Comptroller a supplemental merger application amending, in part, the terms of the transaction. Although the Federal Reserve Board, the FDIC, and the Antitrust Division continued to oppose the merger, it was approved by the Comptroller on May 8, 1979.[7]

The Comptroller, however, conditioned his approval of the transaction upon the divestiture by the defendants of seven of their banking offices to banking organizations without offices located in the market areas serviced by the offices to be divested. In particular, Bancorporation, through its subsidiary, First National State Bank of West Jersey ("FNSB–West"), agreed to sell all three of the offices operated by that subsidiary in Atlantic County. South agreed to sell two of its five Atlantic City offices, as well as two offices located in Burlington County.[8] The Comptroller further based his approved of the merger upon the commitment of Bancorporation and South to form and fund a Community Development Corporation ("CDC") in Atlantic City after consummation of the transaction.[9]

The complaint filed by plaintiff within thirty days of the Comptroller's approval of the transaction seeks to enjoin the merger between FNSB–Central and South on the grounds that it will (1) eliminate substantial direct competition between South and Bancorporation in the Atlantic City, Hammonton, and Atlantic County commercial banking markets; (2) eliminate Bancorporation as an actual potential competitor in these markets; (3) eliminate Bancorporation as a perceived potential competitor in these markets; (4) foster concentration or entrench Bancorporation as the dominant bank in the relevant markets; and (5) trigger other mergers and consolidations in the relevant markets.[10]

The timely filing of the complaint in the instant action stayed the effectiveness of the Comptroller's approval of the transaction. 12 U.S.C. § 1828(c)(7)(A). Thereafter, the court, on September 7, 1979, granted the Comptroller's motion to intervene as of right as a party defendant.[11] The court

---

("Gx") 194. On November 30, 1977, an agreement to merge was signed. Gx 77. The shareholders of the two organizations approved the merger in May, 1978. Gx 66.

**4.** Gx 224.

**5.** Gx 397, p. 3.

**6.** Gx 399, pp. 4–5; Gx 401.

**7.** Gx 398; Gx 400; Gx 402; Gx 385.

**8.** Gx 225; Gx 385.

**9.** Gx 385.

**10.** Plaintiff abandoned its triggering theory prior to trial.

**11.** The office of the Comptroller of the Currency is a part of the United States Treasury Department, with headquarters in Washington, D.C. The Comptroller is charged with a broad scope of regulatory responsibilities respecting national banks in the areas of chartering, branching, bank examinations, mergers, consolidations, conversions, and other areas.

The Comptroller is responsible for insuring the safety, soundness and viability of the national banking system as a whole, the soundness and viability of individual banks subject to his regulation, and the competitiveness of the national banking system. Among other things, the Comptroller has exclusive agency jurisdiction over applications by national banks to merge with other banks, where the resulting bank is also a national bank.

The Comptroller, through his counsel, participated fully in the discovery and trial of the proceeding.

denied the defendants' motion to lift the statutory stay on September 21, 1979.[12]

Trial began on January 29, 1980 and was completed in March of that year. The Antitrust Division called twenty–one witnesses for its case–in–chief and one rebuttal witness. Plaintiff rested its case on February 20, 1980. The bank defendants called nineteen witnesses between February 21 and March 3, 1980. The Comptroller called eight witnesses between March 6 and March 13, 1980. Several hundred exhibits were offered by each party and received into evidence by the court.

## C. BANKING IN NEW JERSEY AND ATLANTIC COUNTY

Prior to 1969, New Jersey state law prohibited branching other than within the county in which that bank had its principal office, and then only in municipalities that did not have the principal office or branch office of another bank.[13] Because of this home–office protection statute, most banking markets within New Jersey were artificially concentrated and non–competitive.[14]

In 1969, the New Jersey Legislature liberalized the state's bank holding company, branching and merger statutes.[15] As a result of the legislature's actions, competition among commercial banks in New Jersey increased. More branch offices opened. Banks kept longer hours, paid depositors higher interest rates, charged lower loan rates, and offered new services.[16]

Because of further amendments to the state's banking laws,[17] competition heightened among commercial banks in New Jersey during the mid–to late–1970's, especially for the business of the locally–limited banking customer, i. e., the small–to–intermediate retail and small–to–intermediate business customer.[18] More specifically, the demise, in large part, of home office protection, the advent of statewide branching, subject to regulatory approval, and the proliferation of mini–branches and automatic teller machines resulted in an increase in local banking options, a decrease in population per banking office in most counties, better prices for existing services, and more convenient hours of banking operation.[19]

This liberalization of statewide branching laws generally has resulted in an increase in the larger banking organizations' statewide market share.[20] This trend, however, has not led to a corresponding increase in concentration in local markets. Rather, competition has increased significantly because of new entry by the larger bank holding companies into local markets from which they previously had been barred.[21]

Since the liberalization of branching laws in New Jersey, Atlantic County has experienced an increase in the number of branch offices and commercial banking organizations serving the county. During the last twelve years, the number of commercial banking offices in the county has increased from 32 to 59, and the number of commercial banking organizations with offices in Atlantic County has increased from 5 to 10. Also, deposits per banking office, as measured in constant dollars, and population per

12. See United States v. First National State Bancorporation, 479 F.Supp. 1339 (D.N.J.1979), for a discussion of the issues involving the appropriateness of lifting the statutory stay that attends bank mergers challenged by the Department of Justice.

13. Schaub, Tr. 4904; N.J.S.A. § 17:9A–19 (1963 ed.).

14. Klebaner, Tr. 5098–99; Hoskins, Tr. 93–94; Schaub, Tr. 4911.

15. Whitesell, Tr. 2296–97; Schaub, Tr. 4903–04. See 1968 N.J.Laws, c. 415, § 1 et seq. (1969).

16. Whitesell, Tr. 2297–300; Schaub, Tr. 4911–12; Intervenor Exhibit ("Ix") 59, p. 208.

17. See 1973 N.J.Law, c. 211, § 1, amending N.J.Stat.Ann. §§ 17:9A–19(B), (G)–(K); 1975 N.J.Laws, c. 148, § 2, amending N.J.Stat.Ann. §§ 17:9A–19(C), (J)–(L).

18. Schaub, Tr. 4920–21.

19. Schaub, Tr. 4911–12; Baxter, Tr. 3828–30; Cartmell, Tr. 2223; Whitesell, Tr. 2298–303.

20. Baxter, Tr. 3823–28.

21. Baxter, Tr. 3823–28; Whitesell, Tr. 2298; Defendants' Exhibit ("Dx") 9.

office have declined.[22] These developments suggest that commercial banks with offices in Atlantic County have been forced to respond to competition with the opening of more convenient locations, despite a disproportionate increase in the costs associated with that effort.[23]

## D. ENTRY INTO AND EXIT FROM BANKING

Notwithstanding the above mentioned effects of the liberalization of the state's branching law, until recently, the economic prospects for Atlantic County, and in particular Atlantic City, were not bright. Once a mecca for tourists and conventioneers, Atlantic City had fallen on hard times.[24] But the legalization of casino gambling in 1976 vastly improved the economic prospects for Atlantic City and the surrounding area.[25] Authorities generally forecast significant economic growth for the region.[26] Many commercial banks, savings banks, and savings and loan associations responded positively to the improved prospects for the region by establishing, or proposing to establish, new branches or offices in the area.[27] Other banks entered, or sought to enter, the region by acquisition.[28] Still others indicated an interest in doing so.[29] In sum, there is a general perception and belief that the competition triggered by the liberalization of the branching laws will continue because of the prospects for economic growth in the region attending the legalization of gambling.[30]

Nevertheless, entry into and exit from commercial banking is the subject of extensive regulation by both federal and state governments. Regulators exercise control over the number of bank charters to be granted and the circumstances under which a bank can open additional branch offices. Thus, any intention of a commercial bank either to enter or expand within a given local banking market, by acquisition or *de novo* branching, is subject to the approval of the responsible regulatory agency.[31] Such approval, moreover, is not automatic: applications for approval to branch by state–chartered depository institutions have been denied on approximately 80 occasions within the past 5 years.[32] Applications for approval to open branches in Atlantic County have also been denied by regulators for discretionary reasons.[33] On the whole, however, the barriers to entry into commercial banking in New Jersey are not high.

## E. LINE OF COMMERCE

Commercial banks presently are the only financial institutions able to offer an entire menu of financial services;[34] only commercial banks can accommodate the financial needs of both small retail and large wholesale customers. However, the combination of two factors reduces considerably the significance of this finding: (1) plaintiff chose to focus its theory of competitive impact upon the "locally–limited customer," *i. e.*, a customer who has $100,000 or less in deposits and who, as a practical matter, can shop

22. Baxter, Tr. 3830–39, 4291–93, 4316; Dx 10–13.

23. Baxter, Tr. 3830–39, 4319–21.

24. Gx 385.

25. Gx 385.

26. *E. g.*, Gideonse *passim*; Shawn *passim*; Gx 368, 375, 375A, 385, 389, 389A.

27. *See, e. g.*, Dx 37; Ix 339–40, 343–45, 347, 390.

28. *E. g.*, Heritage Bancorporation; Midlantic Bank; First Peoples Bank of New Jersey, Westmont; First National State Bancorporation.

29. *See, e. g.*, Klebaner, Tr. 5210–12; Wines, Tr. 2081, 2086–87 (United Jersey Banks); Cartmell, Tr. 2228–30, 2236–37 (Fidelity Union Bancorporation); Davis, Tr. 2625–29 (Bankshares of New Jersey); Etherington, Tr. 3419–21 (Horizon Bancorporation); Walther, Tr. 3449–51 (New Jersey National Bank).

30. *See, e. g.*, Bradway, Tr. 311–12; Kelleher, Tr. 793; Korngut, Tr. 476–86.

31. Baxter, Tr. 3782–83, 4105–06, 4474; Freeman, Tr. 1159; Klebaner, Tr. 4708, 4714, 4718.

32. Freeman, Tr. 1215–16; Dx 114.

33. Baxter, Tr. 4106; Bradway, Tr. 967.

34. Klebaner, Tr. 4197; Bradway, Tr. 1148.

for financial services only among financial institutions located within the relevant geographic market;[35] and (2) commercial banks face competition with respect to most of the financial services they offer.[36]

In the State of New Jersey, mutual savings banks and savings and loan associations ("thrifts") offer essentially the same services to the locally–limited retail customers[37] as do commercial banks. Within this common group of retail services are checking accounts or their equivalent, savings or time accounts, mortgage loans, home improvement loans, installment loans, safe deposit boxes, trust services, drive–in facilities, 24 hour cash dispensing, traveler's checks, and many other commonly used banking services.[38]. Moreover, the recently enacted Depository Institutions Deregulation and Monetary Control Act of 1980 ("1980 Act")[39] insures the elimination of any remaining distinctions between thrifts and commercial banks with respect to retail financial services provided to the locally–limited customer.[40]

Thrift institutions also compete effectively with commercial banks for the deposits of the locally–limited retail customer.[41] Indeed, in New Jersey, commercial banks hold

only 51.8% of the deposits of depository institutions.[42] Their share of deposits has declined steadily since 1945.[43]

Only with respect to the locally–limited wholesale customer[44] do commercial banks offer a cluster of services unequalled by thrift institutions. Commercial banks are the most important source of short and intermediate term credit to the business community, excluding trade credit.[45] Other than loans on commercial real estate and account loans, thrifts do not participate significantly in unsecured rollover or term loans to businesses.[46] Although mutual savings banks are able to offer demand deposit (checking), time deposit and savings deposit accounts to individuals and corporations,[47] a $150,000 deposit limitation on such accounts makes it impractical for mutual savings banks to offer many banking services to commercial customers.[48] Neither state nor federally–chartered savings and loan associations may offer N.O.W. accounts to for–profit corporations.[49]

Commercial banks can offer services to the locally–limited wholesale customer that thrifts cannot. For example, only commercial banks can accept for payment at future

---

**35.** *E. g.*, Hoskins, Tr. 9–11, 28–29, 34–36; Whitesell, Tr. 2400, 2728, 2847. *Accord*, Baxter, Tr. 4197. The relevant geographic market is discussed *infra* in the text accompanying footnotes 51 to 78.

**36.** Klebaner, Tr. 5197–98.

**37.** A retail service is one that is provided to a household or individual. Klebaner, Tr. 4784.

**38.** Baxter, Tr. 3902–03, 4113–15, 4360–62; Klebaner, Tr. 4790–98; Ix 60, 60A, 61.

**39.** P.L. No. 96–221, 94 Stat. 132 (1980).

**40.** *E. g.*, federal savings and loan associations are authorized to issue credit cards and interest ceilings on deposit accounts will be gradually eliminated. 1980 Act, P.L. No. 96–221, §§ 205(a), 402, 94 Stat. 132 (1980).

**41.** Hoskins, Tr. 144–149; Baxter, Tr. 3902–03, 4113–15, 4360–62.

**42.** Dx 39.

**43.** *Id.* A similar pattern emerges in the plaintiff's Atlantic City and Atlantic County markets where, although commercial banks hold rough-

ly two–thirds of the deposits, their share of deposits has declined since 1970. In the Hammonton market alleged by plaintiff, the court discerns an opposite trend: thrifts hold two–thirds of deposits, but their percentage has declined since 1970. Ix 50, 51, 52.

**44.** A wholesale service is one provided to a business enterprise. Klebaner, Tr. 4784.

**45.** Klebaner, Tr. 4953, 5077-78.

**46.** *See* Gx 425a.

**47.** N.J.Stat.Ann. §§ 17:9A-25(4), (5), 17:9A-26(1).

**48.** N.J.Stat.Ann. § 17:9A-184; Freeman, Tr. 1245–46; Whitesell, Tr. 2723-25.

**49.** 12 U.S.C. § 1832(a), *as amended by* P.L. No. 96–161, § 106; 12 U.S.C. § 1832(a), *as amended by* P.L. No. 96–221, § 303. NOW accounts, which are negotiable orders of withdrawal, serve the same function as checking accounts in commercial banks.

dates drafts and bills of exchange drawn upon them; issue letters of credit; discount, buy or invest in bankers' acceptances; buy and sell gold and silver bullion; buy and sell foreign exchange; invest in domestic corporations engaged in international or foreign banking; make loans secured by domestic shipping documents or secured by warehouse receipts conveying or securing title; make loans to small businesses pursuant to New Jersey's Small Business Loan Act; perform data processing services for customers; and assist customers in preparing, handling, and disbursing their payrolls.[50] Only commercial banks can offer armored car services and act as a payroll agent, and are used by other financial institutions in the conduct of their business; for example, for transactions involving payment and credit such as check clearing and clearing of N.O.W. accounts.[51]

## F. SECTION OF THE COUNTRY

The relevant sections of the country within which to assess the alleged anti–competitive effects of the proposed merger between South and Bancorporation's subsidiary FNSB–West vary with the type of customer who allegedly will be harmed by the transaction and with the legal theory under which plaintiff proceeds. Plaintiff's case focused on the locally–limited bank customer.[52] To such a customer, choice of bank depends in large part on the convenience of location of bank offices.[53] Most locally–limited customers prefer to bank where they live or where they shop or where they work.[54] These factors must be considered in defining the relevant geographic section of the country. Conversely, the banking

preferences of customers with $100,000 or more in deposits are irrelevant for the purposes of this case. Such customers can shop in the national banking market for the services they require.

Similarly, the relevant geographic market within which to measure the effects of the proposed merger upon direct competition differs from the geographic market within which to measure the effects of the transaction upon potential competition.[55] Where plaintiff challenges the proposed merger under a direct competition theory, the appropriate section of the country is the area of effective competition or substantial overlap between the acquired and acquiring institutions.[56] On the other hand, under a potential competition theory, the relevant geographic market is the area in which the acquired bank markets its services and competes directly with other commercial banks.[57]

## 1. DIRECT COMPETITION

The most reasonable method of determining the section of the country in which the merging banks compete is to determine the geographic areas from which they draw their business. Where the geographic areas intersect, the banks compete directly.[58] Implicit in such an analysis is the generally valid assumption that bank customers within the area of overlap can conveniently turn to any of the competing banks for banking services.[59]

Dr. Baxter made such an analysis. It shows that FNSB–West competes only in a very small geographic portion of Atlantic County: a strip, five to seven miles wide, along the White Horse Pike between the outskirts of the City of Hammonton and the

---

**50.** 12 U.S.C. §§ 24 (seventh), 372, 373, 601; N.J.Stat.Ann. §§ 17:9A–25, 25.5, 59.25, 59.26.

**51.** Freeman, Tr. 1244–45; Klebaner, Tr. 5072, 5075–77.

**52.** *See* note 35 and accompanying text, *supra.*

**53.** Hoskins, Tr. 24–25; Elwell, Tr. 3491; Baxter, Tr. 4164; Klebaner, Tr. 4766, 5100; Street, Tr. 5035; Max, Tr. 5339.

**54.** Hoskins, Tr. 24–25; Korngut, Tr. 459–60; Bradway, Tr. 933, 945; Kirkman, Tr. 1745–55;

Ferguson, Tr. 3240–41; Chucas, Tr. 3666; Baxter, Tr. 4164; Max, Tr. 5339.

**55.** Baxter, Tr. 4115.

**56.** Baxter, Tr. 4115, 4192–93; Max, Tr. 5285–86.

**57.** Baxter, Tr. 4193–95.

**58.** Baxter, Tr. 4115.

**59.** *Id.*

Garden State Parkway.[60] The area of overlap between FNSB–West and South is a portion of Hammonton, west of the Mullica Township line. The proposed merger would eliminate direct competition in this area in the absence of the divestitures required by the Comptroller which will preserve the three offices presently operated by Bancorporation as competitors.[61]

## 2. POTENTIAL COMPETITION

Unlike direct competition theory which focuses on the present effects of a merger in the area in which the parties compete, potential competition theory centers on the future competitive effects of a proposed merger. Because of the difference in perspective between the two antitrust theories, the method used to determine the relevant section of the country for the purposes of one theory might be inappropriate for the purposes of the other. The circumstances of this case suggest that a broader rather than narrower approach to the issue concerning the relevant geographic market under a potential competition theory is appropriate, especially because the market is going to grow and become more integrated.[62]

The Philadelphia Federal Reserve Bank ("Philadelphia Federal") has identified certain geographic banking markets for southern New Jersey; the Atlantic City market and the Hammonton market, each of which plaintiff alleges in the complaint.[63] The Philadelphia Federal based these markets on the general patterns of social and economic integration in this region and on the attributes of local banking.[64] It developed

the two markets to aid research on banking competition and to provide a framework for the evaluation of the competitive effects of bank mergers within its jurisdiction.[65]

The Philadelphia Federal defined these markets in terms of customers with deposits of $100,000 or less;[66] i. e., the locally–limited customer. It based the definitions on the following factors: location of bank offices; location of roads; population data; income data; retail sales draw; types of employment; levels of employment; geographic barriers; Standard Metropolitan Statistical Area definitions ("SMSA"); Ranally Metropolitan Area definitions, formulated by Rand McNally Co., and based largely on commuting patterns; surveys of local banking customers; and surveys of local bankers.[67] These are the types of information that, when analyzed, reasonably will indicate the boundaries of commercial banking markets.[68]

In formulating their markets definitions, the staff of the Philadelphia Federal plotted the location of bank offices and, then, surveyed the geographic, demographic, economic, and transportation data. The staff then revised the tentative market lines based on this information on the basis of information gathered in interviews with bankers and banking customers in the areas in question.[69] The Atlantic City banking market as defined by the Philadelphia Federal includes the eastern three–quarters of Atlantic County and a portion of northern Cape May County.[70] The Hammonton banking market as defined by the Philadel-

---

**60.** Baxter, Tr. 4116.

**61.** Baxter, Tr. 4192–93. *See* note 8 and accompanying text, *supra.*

**62.** *See* Max, Tr. 5329–30.

**63.** Complaint ʿ 3; Hoskins, Tr. 1–27; Ix 150E.

**64.** Hoskins, Tr. 6, 10–11; Whitesell, Tr. 2358–60.

**65.** Hoskins, Tr. 7, 41.

**66.** Hoskins, Tr. 28–29.

**67.** Hoskins, Tr. 22–27, 35.

**68.** Hoskins, Tr. 8–13; Whitesell, Tr. 2358–59, 2361–62. *See also* Baxter, Tr. 4163; Klebaner, Tr. 5066–68; Max, Tr. 5340.

**69.** Hoskins, Tr. 23–27.

**70.** The following municipalities are included: Absecon; Absecon Highlands; Atlantic City; Brigantine; Corbin City; Egg Harbor City; Egg Harbor Township; Estelle Manor; Galloway Township; Hamilton Township; Linwood; Longport; Margate City; Marmora; Mays Landing; Northfield; Ocean City; Ocean View; Pleasantville; Pomona; Port Republic; Sea Isle City; Smithville; Somers Point; Strathmore; Sweetwater; Tuckahoe; Upper Township; Ventnor City. Gx 429 a & b; Gx 505a.

phia Federal includes primarily the western quarter of Atlantic County and the eastern quarter of Camden County.[71]

The Atlantic City and Hammonton markets, as defined by the Philadelphia Federal, are reasonable market areas within which to evaluate under a potential competition theory the competitive effects of the proposed merger.[72] South markets its services and competes directly with other commercial banks within both of these market areas.[73] Moreover, because of the current and expected economic growth of Atlantic County, the Atlantic City and Hammonton banking markets will merge, creating a single banking market which generally will be equivalent to the boundaries of Atlantic County.[74]

The Federal Reserve Bank of New York ("New York Federal") defined an Atlantic City banking market which includes six municipalities in Ocean and Burlington Counties north of Atlantic County, follows Atlantic County's western border and most of its southern border, and includes the municipality of Ocean City in Cape May County.[75] Although the comptroller urges the court to consider the competitive effects of the merger with reference to the New York Federal's Atlantic City banking market, the court declines this invitation. First, the New York Federal's market fails to account for the large bay and wildlife refuge area along Atlantic County's northern border.

This natural barrier causes the commutation and economic ties of the population immediately above the border to flow north into Ocean and Burlington Counties, not south into Atlantic County.[76] Second, none of the four largest banks in the Philadelphia Federal's Atlantic City market have offices in the area immediately north of the county border.[77] Finally, the economic growth that is expected to occur in the region will more likely extend west rather than north because of the natural barrier above Atlantic County.[78]

## G. DIVESTITURES

As noted previously, the most reasonable section of the country within which to evaluate the competitive effects of the proposed merger under a direct competition theory is the strip, five to seven miles wide, along the White Horse Pike between the outskirts of the City of Hammonton and the Garden State Parkway.[79] This is the area where South and FNSB–West compete directly.[80]

However substantial the competition between South and FNSB–West in the market area developed by Dr. Baxter or in any of the alleged geographic markets, the divestitures required by the Comptroller as a condition to the consummation of the merger will eliminate the anti–competitive effects that would otherwise attend a union of two direct competitors.[81] The divesti-

71. The following municipalities are included: Elwood; Elm; Folsom; Franklin Township; Hammonton; Mizpah; Monroe Township; Mullica Township; Waterford Township; Town of Weymouth; Winslow Township (portion). Gx 429 a & b; Gx 505a.

72. Hoskins, Tr. 64; Whitesell, Tr. 2359–60.

73. Whitesell, Tr. 2367–73, 2375; Gerhart, Tr. 1283 ·87; Gx 485; Gx 487; Gx 275–330.

74. Hoskins, Tr. 41–42; Whitesell, Tr. 2408. See also Korngut, Tr. 476–77; Elwell, Tr. 3492–93; Bradway, Tr. 1073–75; Klebaner, Tr. 4744; Gerhart, Tr. 1274–76; Bradway, Tr. 892, 940–41; Gx 320; Gx 505a.

75. Ix 378; Gx 429; Ix 150a–e; Ix 378, p. 1; Ix 379.

76. Hoskins, Tr. 39–40; Gx 505a.

77. Max, Tr. 5334; Dx 103; Ix 150e.

78. Hoskins, Tr. 184; Gx 429 a & b.

79. See notes 58 to 61 and accompanying text, supra. Although Bancorporation made some commercial loans in Atlantic County, the dollar size of the loans indicates that most of the borrowers would not fall within the definition of a locally–limited bank customer. See Knapp, Tr. 1551–55; Gx 344. See also Baxter, Tr. 4196–97; 4223–25, 4482–83; Ferguson, Tr. 3203–08.

80. See, e. g., Miles, Tr. 3541, 3556–57; Whitesell, Tr. 2375; Haslett, Tr. 3582–83; Gerhart, Tr. 1261, 1282, 1294.

81. Baxter, Tr. 3752, 4193; Klebaner, Tr. 4768–4769.

tures would instate at the former FNSB–West locations new banks that would become direct horizontal competitors of the merged entity to the same extent that FNSB–West was a competitor of South prior to the merger. Although the purchasers of the divested offices will likely experience some loss of deposits,[82] because of the relative economic and geographic isolation of the three Atlantic County offices of FNSB–West which are required to be divested, most of the deposits associated with those offices will be fully transferred to and retained by the purchasing banking organization.[83]

Even assuming a greater percentage of deposit loss, it is reasonable to believe that the divestitures will cause the intended competitive effect. The availability of three FNSB–West and two South offices will serve as an inducement to enter to banking organizations that might otherwise delay market entry.[84] Once in the market, the purchasers will compete for additional market share.[85] Moreover, every dollar of deposit retained by the purchaser will have an immediate deconcentrating effect.[86]

## H. COMPETITIVENESS OF MARKET

At first glance, each of the relevant geographic banking markets looks non–competitive. The Philadelphia Federal's Atlantic City market had in 1979 two–firm, three–firm, and four–firm concentration ratios of 70.2%, 81.2%, and 87.7% respectively.[87] The concentration ratios in the Hammonton market in 1979 were likewise high: a two–firm ratio of 51.8%, a three–firm ratio of 64.7%, and a four–firm ratio of 77.3%.[88] Similarly, the 1979 concentration ratios for the Atlantic County market show a two–firm ratio of 70.6%, a three–firm ratio of 82.1%, and a four–firm ratio of 86.4%.[89]

Besides the high concentration ratios in each of the alleged geographic markets, plaintiff produced some evidence that the actors in those markets act non–competitively. For example, South's loan policy can be characterized as conservative. It invests heavily in government securities and mortgages while maintaining a low loan–to–deposit ratio.[90] Two of South's main competitors in the relevant markets, Atlantic National Bank and Guarantee Bank, are above the state median in United States Government securities and in total securities–to–assets.[91] The loan–to–deposit ratio for each of the top six banks in Atlantic County declined between 1974 and 1978.[92]

Notwithstanding the above indices of non–competitive behavior in the relevant markets, the overwhelming weight of the

82. Ferguson, Tr. 2026; Etherington, Tr. 3432.

83. Baxter, Tr. 3752, 3885, 3997–98; Miles, Tr. 3540–57; Ferguson, Tr. 2027–28; Elwell, Tr. 3480; Davis, Tr. 2629; Max, Tr. 5283–85.

84. Baxter, Tr. 3884, 3998–99; Cartmell, Tr. 2236-37; Sutton, Tr. 3261; Wines, Tr. 2086–87; Walther, Tr. 3450–51.

85. The experience of Coastal State Bank ("Coastal") is relevant in this regard. In 1972, Coastal bought the Pleasantville branch of Heritage Bancorporation ("Heritage"). Although Heritage retained 50% of the deposits of that branch, by 1974 Coastal's deposits in the acquired office had grown more than 800%. Ix 16; Korngut, Tr. 548–49. Since then, the office has continued to grow rapidly. See Ix 16.

86. Baxter, Tr. 3873–75; Dx 27–29.
Because of the importance of effective divestitures to the direct competition aspect of the case, the court will require that the sellers of the branches fulfill the following conditions to maximize deposit retention at the divested branches. The sales contracts shall: (1) require account transfers by operation of law; (2) permit full staff solicitation by acquiror; and (3) require the seller to sell all loans which are associated with the office which the acquiror wishes to buy. These conditions are in addition to any conditions set by the Comptroller. The court will retain limited jurisdiction over the case until such time that it is satisfied that the conditions have been met.

87. Ix 50.

88. Ix 52.

89. Ix 51.

90. Max, Tr. 5400–02; Ix 75; Ix 116.

91. Ix 75.

92. Ix 114.

evidence establishes that each of the markets is competitive. This ultimate finding stems from numerous subsidiary findings regarding the reliability of concentration ratios as evidence of the competitiveness of markets, the historical trend toward deconcentration in the relevant geographic markets, competition from thrift institutions, loan activity as an alternative measure of market power, future pro–competitive trends in the area, the required divestitures, and actual evidence of pro–competitive behavior.[93] Moreover, that defendants have affirmatively established the absence of collusion or parallel behavior among commercial banks contributes to the finding that the relevant markets are presently competitive.

There is no automatic, direct relationship between a particular concentration ratio and the competitive performance in any particular banking market; concentration ratios based on commercial bank deposits are useful only as a starting point of analysis.[94] From this initial analysis, one must thereafter study actual performance of market participants to determine the competitiveness of the market.[95]

One indication of competition in the market place is the trend in concentration over a number of years.[96] In each of the alleged geographic markets during the last decade, the trend has been towards less concentration.[97] In addition to declining concentration ratios, the market shares of most of the banks competing in the markets have shifted. This factor too indicates a competitive market structure.[98] But most significantly, South's market share in each of the alleged geographic markets during the last decade has decreased dramatically.[99] The decline in South's share is consistent with the proposition that the alleged markets are presently competitive and totally inconsistent with the notion that the banks in the markets engage in interdependent and parallel behavior.[100]

The decline in concentration ratios, shift in market shares, and decrease in South's market share are more pronounced when one considers the deposits of thrift institutions which now have offices within the alleged geographic markets.[101] Moreover, that numerous thrifts intend to enter or expand within the relevant markets is evidence of competition for the deposits and business of the locally–limited retail customer.[102]

Insofar as the commercial loan function presently distinguishes the business of commercial banks from that of thrifts, it is desirable to examine loan activity, as opposed to deposit–based market share, to ascertain the market power of competitors in the relevant geographic markets.[103] When this is done, South's alleged market power diminishes. South has a very low ratio of commercial and industrial loans to assets, approximately one–half of the state

93. The court agrees with plaintiff that out–of–area banks do not compete significantly in the relevant markets. *See, e. g.,* Cartmell, Tr. 2247–48; Kirkman, Tr. 3357; Whitesell, Tr. 2842.

94. Klebaner, Tr. 4964–75.

95. Baxter, Tr. 4248–49.

96. Klebaner, Tr. 5007–08.

97. Baxter, Tr. 3839, 3854–60, 3862–71, 4322–26; Klebaner, Tr. 4980, 4985, 5006; Max, Tr. 5287–5301; Dx 25–30, 119; Ix 49–56, 376.

98. Baxter, Tr. 3854–60; Klebaner, Tr. 4980, 4987; Dx 26; Ix 50.

99. Ix 48–55.

100. Klebaner, Tr. 4978-82.

101. Ix 48–55. It is reasonable to take into account the deposit shares of thrifts to see the banking alternatives available to locally–limited retail customers. Klebaner, Tr. 4953. *Accord,* Hoskins, Tr. 175–76.

102. The thrifts which intend to enter or expand are Howard Savings Bank, the largest depository institution in the state, Anchor Savings & Loan Association, First Savings & Loan Association of Brunswick, Collective Federal Savings & Loan Association and Vineland Savings & Loan Association. Klebaner, Tr. 4827; Ix 63, 343–345, 347.

103. Klebaner, Tr. 4953–55; Max, Tr. 5360.

median.[104] The aggregate of South's commercial and industrial loans is even less in total than Guarantee Bank, which is overall a substantially smaller organization when measured by deposits.[105] Further, most of the commercial banks in Atlantic County have much greater relative lending activity than South. Even the smaller banks as measured by deposits utilize a higher percentage of their deposits for lending purposes.[106]

Even assuming that commercial banks do not compete with thrift institutions and that deposit–based market shares accurately reflect market power, the number of commercial bank entrants recently and in the near future because of the divestitures required by the Comptroller evinces a present and future pro–competitive trend in the alleged geographic markets. For example, since 1970, five major commercial banks have entered the Philadelphia Federal's Hammonton market and have captured 44.2% of the deposits in that market.[107] Similarly, three banks have entered the Atlantic City market since 1970; two of these banks, Atlantic National and Coastal, have since been acquired by the second and fifth largest banks in the state.[108] The Atlantic County market mirrors the developments of the smaller two markets; since 1969, the number of commercial banking options increased from five to ten.[109]

The divestitures required by the Comptroller will insure a continuation of this competitive trend. As many as three banks

will enter the Philadelphia Federal's Atlantic City market; one bank will enter the Philadelphia Federal's Hammonton market.[110] The number of banking options will correspondingly increase within the Atlantic County market.[111]

In addition to these structural indicia of competitive behavior in the relevant sections of the country, the actual performance of the banks in these areas confirms that the markets are performing competitively. The rates and fees charged or paid by commercial banks with offices located in the relevant markets differ significantly among competitors.[112] The large majority of small business customers maintain relationships with more than one bank.[113] Different banks have supplied leadership with respect to the establishment of new services and products; no one bank has led the pack.[114] Similarly, the hours of operation of commercial banks with offices within the relevant markets vary significantly.[115] Finally, all commercial banks in the alleged markets have active ongoing solicitation programs designed to reach both existing and new customers, as well as known customers of competing banks.[116] Such activities establish the competitiveness of the market and the absence of collusive behavior by market participants.

## I. POTENTIAL ENTRANTS

There is a substantial pool of commercial banks which will be attracted into the Atlantic City, Hammonton, and Atlantic

**104.** Klebaner, Tr. 4957; Ix 75.

**105.** Klebaner, Tr. 4960. *See* Ix 75, 116, 367.

**106.** Klebaner, Tr. 4960–61; Ix 114–16.

**107.** Ix 52.

**108.** Ix 50; Dx 1, 28. Midlantic Banks announced in February, 1980, that it intended to acquire Atlantic National Bank. Dx 108. The acquisition was consummated without legal challenge on the thirtieth day after the Comptroller's approval of the transaction.

**109.** Ix 51.

**110.** Gx 225; Ix 28, 30.

**111.** Ix 51; Gx 225, 385.

**112.** Dx 75, 76, 105, 107, 110, 130, 136; Baxter, Tr. 4048–51, 4101, 4379–81, 4402–03.

**113.** Baxter, Tr. 4102–04.

**114.** Baxter, Tr. 4059–60, 4064–66, 4101, 4411–13; Korngut, Tr. 468–472; Kelleher, Tr. 778–784; Bradway, Tr. 922, 1037–1038; Kirkman, Tr. 3311–12.

**115.** Baxter, Tr. 4051–53; 4379–80; Max, Tr. 5389–91; Dx 77, 77A.

**116.** Baxter, Tr. 4058–59, 4104–05; Korngut, Tr. 510–11; Bradway, Tr. 972; Elwell, Tr. 3471–72; Gerhart, Tr. 1289–90.

County markets, should the anticipated upsurge in the local economy occur.[117] These potential entrants include the largest commercial banking organizations in the state, 15 of which have over $500 million in assets, and most of which have begun, or are in the process of establishing, statewide expansion programs.[118] Although these largest banking organizations are most capable of expanding into the relevant markets, a large number of smaller banking organizations which serve regional markets adjacent to Atlantic County are also capable of entering the relevant markets.[119] Moreover, the proposed divestitures will provide interested out–of–area banking organizations with a base of operations in the alleged markets.[120] In the absence of interested entrants, the preconditions imposed by the Comptroller will not be satisfied;[121] hence the Comptroller would not permit the consummation of the transaction.

## J. ALTERNATIVE MEANS OF ENTRY

If the court were to enjoin the proposed transaction, the evidence indicates that Bancorporation probably would expand within the relevant geographic markets by alternative means.[122] Bancorporation, as the largest banking organization based in New Jersey, has the financial and managerial capability to expand throughout Atlantic County.[123] It has established banking relationships with many Atlantic City casinos from which significant other business may flow[124] and, through its subsidiary in Newark, has made loans to other Atlantic County businesses and to local governments in the area.[125]

These facts, without more, would not necessarily establish a desire by Bancorporation to expand within Atlantic County. However, Bancorporation is committed to acquiring and maintaining a strong retail base; it seeks to expand within markets with an attractive retail trade because the retail customer provides a bank with its most inexpensive source of funds.[126] Thus, expanding within a growing Atlantic County would enable Bancorporation to develop further its commercial contacts in the area and to secure inexpensive funds. Additionally, in 1974, when Bancorporation first entered Atlantic County, it indicated an intention to expand in the future.[127] There is little reason to believe that it will not act on its intentions if the proposed merger were enjoined.

## K. LONG TERM BENEFITS TO MARKET

Notwithstanding the strong probability that Bancorporation would expand *de novo* within the geographic markets absent this merger, the competitive benefits attending

117. Klebaner, Tr. 5210–11.

118. Baxter, Tr. 4072–81, 4094–4100, 4125·26, 4488–93; Cartmell, Tr. 2220; Wines, Tr. 2080–82; Davis, Tr. 2623–29, 2648; Etherington, Tr. 3419–21; Stanton, Tr. 3437, 3440; Walther, Tr. 3450, 3460; Bell, Tr. 3915–16; Klebaner, Tr. 4745–46; Dx 1, 66.

119. Wines, Tr. 2070–71; Baxter, Tr. 4094–100, 4125–26. Some banks have indicated an interest in entering the relevant markets. *See* note 29, *supra.*

120. Baxter, Tr. 4098–99; Kelebaner, Tr. 4746–47; Dx 27–30; Gx 385.

121. Gx 385.

122. Bancorporation, of course, is already present in the relevant markets by virtue of its subsidiary, FNSB–West.

123. Whitesell, Tr. 2459–61. Bancorporation is the largest banking organization in terms of deposits in New Jersey. *See* note 2, *supra.*

124. Spony, Tr. 1607–27; Dx 62; Fx 142; Gx 39; Kelleher, Tr. 767; Bradway, Tr. 902, 1049–50; Gerhart, Tr. 1353; Gx 337; Michael, Tr. 1432; Knapp, Tr. 1492, 1496; Faherty, Tr. 1567; Gx 44.

125. Spony, Tr. 3516–18; Faherty, Tr. 1565–69; Gx 202; Dx 148.

126. Ferguson, Tr. 1955–56.

127. Ferguson, Tr. 1971–75; Gx 13, p. A–33. Moreover, given New Jersey's liberal branching laws, the barriers to entry because of regulatory obstacles is low. *See* notes 13 to 24 and accompanying text, *supra.* *See also* Freeman, Tr. 1166–98; Dx 13; Gx 418.

the proposed transaction are greater than those which can be expected to obtain prospectively. The merger as approved by the Comptroller offers two immediate benefits: an aggressive and sophisticated competitor replaces South in the relevant markets and forces competing banking organizations to react to its competitive initiatives; [128] and, as many as four commercial banking organizations secure a toehold in the geographic markets with a resulting decrease in concentration ratios and increase in the number of banking options available to the locally–limited customer.[129] Competition in the relevant markets will increase immediately as a result of the merger.

The alternative course urged by plaintiff likewise will have pro–competitive effects, albeit delayed and lesser than those accompanying the proposed merger. South, in the face of a consistently declining market share, must compete more aggressively or continue to lose market share. Bancorporation, absent the merger, will utilize its significant financial and managerial resources to expand its presence within the geographic markets.[130] The pro–competitive effects of enjoining the proposed transaction, however, are attenuated and relatively insignificant when compared with the benefits immediately attending the consummation of the merger.

**128.** Kelleher, Tr. 831, 886; Whitesell, Tr. 2828–31; Max, Tr. 5324, 5475. *Accord*, Baxter, Tr. 4133-34; Bradway, Tr. 1141, 1145.

**129.** Klebaner, Tr. 5204; Max, Tr. 5475; Gx 225, 385; Ix 58.

**130.** Whitesell, Tr. 2336–2343, 2459–01.

**131.** Kelleher, Tr. 772, 801; Bradway, Tr. 911. Although Mr. Korngut testified that he perceived Bancorporation as likely to expand within the relevant markets, he formed his "perception" in winter of 1977, many months *after* the proposed transaction was announced in newspapers. Korngut, Tr. 476–80; Bradway, Tr. 1053–54. Moreover, other large banking organizations were perceived to be potential entrants. *E. g.*, Korngut, Tr. 478; Elwell, Tr. 3482; Bradway, Tr. 911–12. Finally, Bancorporation could not have been "perceived" as "likely to enter," as opposed to "likely to expand," because it was already present in each

## L. PERCEPTIONS AND REACTIONS OF COMPETITORS

Although plaintiff elicited testimony from some of its witnesses that they perceived Bancorporation as one of the most likely entrants into the market,[131] there was no credible, direct evidence that banks in the relevant markets altered their conduct because of such perceptions.[132] Circumstantial evidence adduced at trial, however, indicated that Guarantee Bank reacted to its perception of Bancorporation as an entrant in concert with its perception of the needs of the casinos and the necessity to be competitive in servicing those needs.[133] Further, the market behavior of another major bank in the relevant geographic markets was influenced by its perception regarding the intentions of Bancorporation.[134]

## M. POSSIBILITY OF ENTRENCHMENT

If the merger is consummated, the new bank, First National State Bank of South Jersey ("FNSB–South"), will be the strongest competitor in each of the relevant markets. Its competitive advantages will include: (1) the largest branch network in Atlantic County; (2) strategically located branch facilities; (3) immediate name recognition; (4) a substantial deposit base; (5) a loan portfolio; (6) an established local staff; (7) an on–operations network; and (8) the resources of Bancorporation's subsid-

of the alleged relevant markets through its ownership of FNSB–West.

**132.** For example, the Board of Directors of Atlantic National Bank never passed any resolutions adopting corporate conduct based on anticipation of Bancorporation entering the market and never changed the price of any of their significant services because of a perception that Bancorporation would enter. Kelleher, Tr. 819–20. Similarly, Guarantee Bank was unable to produce a single document that memorialized its response to Mr. Bradway's perceptions with respect to potential competition. Bradway, Tr. 1005–06.

**133.** Bradway, Tr. 916, 1005–06. Guarantee's actions were consistent with the court's findings that the markets are presently competitive.

**134.** Kelleher, Tr. 822–23.

iaries at its disposal.[135] Even though FNSB–South would be a most formidable competitor, its presence in the markets will not deter other banking organizations from entering.[136] Indeed, the divestitures will encourage entry within the relevant markets and accelerate the timetable of certain institutions to enter.[137]

The banking institutions which decide to enter the relevant markets can do so easily. There are no large financial barriers to entry; the amount of capital needed to form a new bank is relatively small, between $1 and $3 million.[138] Moreover, although prospective bank entrants must hurdle numerous regulatory obstacles before receiving permission to enter the relevant markets, regulators in banking are likely to grant approval of new entry precisely where entrenchment might occur.[139] Thus the consummation of the proposed merger will not entrench FNSB–South in any of the relevant markets.

## N. EFFECT OF MERGER ON CONVENIENCE AND NEEDS

Assuming, for the moment, that the proposed merger would tend substantially to lessen competition on commercial banking within the alleged geographic markets, there is little reason to believe that such anti–competitive effects would be outweighed by the convenience and needs of the community to be served.[140] Although Bancorporation intends to increase the loan–to–deposit ratio of South,[141] the record

does not indicate that the relevant markets suffer from a shortage of available credit.[142] Only the casinos and a few other large businesses require loans above the legal lending limit of South,[143] but these borrowers shop for credit in a national market, and the effect of the merger on Bancorporation's ability to compete in the national market would be de minimus.[144]

Defendants are committed, if the merger is approved, to establish a Community Development Corporation ("CDC") under the authorization of the Comptroller which will take an active role in community affairs and provide credit and counseling services to small businessmen, consumers, and homeowners. CDCs can serve particularly important functions in a community such as Atlantic City, which is in great need of community counseling to small businessmen and funds to assist in the resettling of displaced inner city residents.[145] It is impossible, however, to determine at this juncture what particular segment of Atlantic County's population might benefit from a CDC. CDCs authorized by the Federal Reserve Board must serve those with low incomes, but CDCs authorized by the Comptroller may be intended for more affluent members of the community.[146] One CDC authorized elsewhere by the Comptroller appears to be catering to the needs of more prosperous citizens.[147]

In the absence of a genuine commitment to help those who are most in need–those with low incomes–the CDC will largely pro-

---

135. Korngut, Tr. 462, 464; Bradway, Tr. 1134.

136. Davis, Tr. 2627; Sutton, Tr. 3259–60; Etherington, Tr. 3419–20; Stanton, Tr. 3440–41; Walther, Tr. 3451–52. Since the announcement of the proposed merger, several depository institutions have sought to enter the relevant markets either de novo or by acquisition. E. g., Ix 335, 339, 343, 344, 347; Bell, Tr. 3916.

137. Baxter, Tr. 3875, 3998–4000; Cartmell, Tr. 2236–37; Sutton, Tr. 3261; Klebaner, Tr. 4746–47.

138. Baxter, Tr. 4119–20.

139. Baxter, Tr. 4119.

140. The court, of course, has found that the proposed transaction would not have anti–competitive effects in the alleged markets.

141. Ferguson, Tr. 3180; Baxter, Tr. 3996; Gx 385.

142. See Bradway, Tr. 1071–72.

143. Kirkman, Tr. 3346.

144. Max, Tr. 5490–91.

145. Vitarello, Tr. 4591–4609; Rash, Tr. 4536–70; Gx 225; Gx 385.

146. Rash, Tr. 4571; Vitarello, Tr. 4614.

147. See Rash, Tr. 4567, 4573.

vide services otherwise obtainable by members of the community.[148] Moreover, CDCs make corporate and economic sense for a bank,[149] and thus it is reasonable to expect that banks in the area will form CDCs should the social and economic conditions warrant such action. Therefore, the court finds that the assumed anti–competitive effects of the merger will not be outweighed by the convenience and needs of the community to be served.

## III

## LEGAL DISCUSSION

### A. SECTION 7 OF THE CLAYTON ACT

Section 7 of the Clayton Act,[150] the substantive basis of the instant case, seeks to arrest mergers "at a time when the trend to a lessening of competition in a line of commerce [is] still in its incipiency." *United States v. Marine Bancorporation*, 418 U.S. 602, 622, 94 S.Ct. 2856, 2870, 41 L.Ed.2d 978 (1974); *Brown Shoe Co. v. United States*, 370 U.S. 294, 317, 82 S.Ct. 1502, 1519, 8 L.Ed.2d 510 (1962). The language of Section 7 reflects this purpose: it proscribes mergers whose effects "*may* be substantially to lessen competition" "in any line of commerce in any section of the country." 15 U.S.C. § 18 (emphasis supplied); *United States v. Philadelphia National Bank*, 374 U.S. 321, 355, 83 S.Ct. 1715, 1737, 10 L.Ed.2d 915 (1963). Thus, unlike other antitrust statutes[151] which deal with "*clear–cut* menaces to competition," the Clayton Act proscribes "[m]ergers with a *probable* anti–competitive effect . . .." *Brown Shoe Co. v. United States*, 370 U.S. 294, 323, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962) (emphasis supplied).[152]

However, before assessing the probable anti–competitive effects of the proposed merger between Bancorporation and South, the court must determine the parameters of its inquiry; *i. e.*, the relevant line of commerce and section of the country which comprise the area of effective competition for the purposes of this antitrust action. *United States v. Marine Bancorporation*, 418 U.S. 602, 618, 94 S.Ct. 2856, 2868, 41 L.Ed.2d 978 (1974); *Brown Shoe Co. v. United States*, 370 U.S. 294, 324, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962); *United States v. Dupont & Co.*, 353 U.S. 586, 593, 77 S.Ct. 872, 877, 1 L.Ed.2d 1057 (1957). Plaintiff must establish these "necessary predicates" to a Clayton Act violation or its case fails. *See, e. g., United States v. Connecticut National Bank*, 418 U.S. 656, 669–70, 94 S.Ct. 2788, 2796–2797, 41 L.Ed.2d 1016 (1974).

### 1. RELEVANT LINE OF COMMERCE

Plaintiff's allegation that the business of commercial banking is a relevant line of commerce for the purposes of assessing the effects of the proposed merger is in accord with a line of Supreme Court precedents. *See United States v. Connecticut National Bank*, 418 U.S. 656, 94 S.Ct. 2788, 41 L.Ed.2d 1016 (1974); *United States v. Marine Bancorporation*, 418 U.S. 602, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974); *United States v. Phillipsburg National Bank*, 399 U.S. 350, 90 S.Ct. 2035, 26 L.Ed.2d 658 (1970); *United States v. Philadelphia National Bank*, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). In the most recent of these cases, *United States v. Connecticut National Bank*, 418 U.S. 656, 94 S.Ct. 2788, 41 L.Ed.2d 1016 (1974), the court was faced with a contention similar to one raised by defendants in the instant case; that thrift institutions should be included within the relevant line of commerce because they compete significantly with commercial

---

**148.** *E. g.*, revitalization of Atlantic City's housing stock will probably develop without a CDC. *See* Ix 390 (construction of 563 housing units has begun; plans for 6884 have been announced).

**149.** Rash, Tr. 4572–73.

**150.** 15 U.S.C. § 18.

**151.** *E. g.*, the Sherman Anti-trust Act, 15 U.S.C. § 1 *et seq.*

**152.** "[N]o statute was sought for dealing with *ephemeral* possibilities." *Brown Shoe Co. v. United States*, 370 U.S. 294, 323, 82 S.Ct. 1502, 1522, 8 L.Ed.2d 510 (1962) (emphasis supplied).

banks "to the degree that they offer identical or essentially fungible services." *Id.* at 662, 94 S.Ct. at 2793. The Court rejected this argument and found that the business of commercial banking was sufficiently distinct to merit treatment as a separate line of commerce. *Id.* at 663, 94 S.Ct. at 2793. Although the Court distinguished between commercial banks and other depository institutions on the basis that commercial banks provide a unique cluster of services to commercial customers, *id.* at 665, 94 S.Ct. at 2794, it did not carve this distinction in stone:

> At some stage in the development of savings banks, it will be unrealistic to distinguish them from commercial banks for purposes of the Clayton Act. . . . [T]hat point may well be reached when and if savings banks become significant participants in the marketing of bank services to commercial enterprises.

*Id.* at 666, 94 S.Ct. at 2795.

■ In the instant case, it cannot yet be said that thrift institutions have become "significant participants in the marketing of bank services to commercial enterprises." The evidence adduced at trial indicated that thrifts compete directly with banks for the business of the locally–limited retail customer, but that they faced numerous obstacles to the development of significant wholesale accounts. Even though thrift institutions in New Jersey have been given a freer rein to compete for commercial customers than thrifts in most other states, and even though the Depository Institutions Deregulation and Monetary Control Act of 1980 [153] authorizes thrifts to engage in activities once reserved for commercial banks, thrift institutions do not at this time utilize their resources to compete significantly for commercial customers in New Jersey. Therefore, the business of commercial banking is the appropriate line of commerce for the purposes of this antitrust action.

### 2. RELEVANT SECTIONS OF THE COUNTRY

■ Although the proscription expressed in Section 7 of the Clayton Act against mergers whose effects may tend substantially to lessen competition in the relevant markets "applies alike to actual– and potential–competition cases," *United States v. Marine Bancorporation*, 418 U.S. 602, 622, 94 S.Ct. 2856, 2870, 41 L.Ed.2d 978 (1974), the legal standard to be used to determine the appropriate "section of the country" or geographic market within which to evaluate the effects of a merger differs slightly with plaintiff's choice of antitrust theories upon which to proceed. *Compare United States v. Marine Bancorporation*, 418 U.S. 602, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974) (potential competition theory) *with United States v. Philadelphia National Bank*, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963) (actual competition theory). In a potential competition case, the relevant geographic market is "the area in which the goods or services at issue are marketed to a significant degree by the acquired firm." *United States v. Marine Bancorporation*, 418 U.S. 602, 621, 94 S.Ct. 2856, 2865, 41 L.Ed.2d 978 (1974). In a direct or an actual competition case, the relevant section of the country is the area of competitive overlap between the acquiring and the acquired firms. *United States v. Philadelphia National Bank*, 374 U.S. 321, 357, 83 S.Ct. 1715, 1738, 10 L.Ed.2d 915 (1963).

Notwithstanding the difference in focus embodied in the legal standards used to determine the relevant geographic markets for potential and actual competition cases, the Supreme Court has advanced a general, localized approach to the problem of constructing the proper section of the country within the meaning of § 7 of the Clayton Act. *United States v. Connecticut National Bank*, 418 U.S. 656, 667–68, 94 S.Ct. 2788, 2795, 41 L.Ed.2d 1016 (1974). In each case, the relevant geographic market: (1) must be drawn narrowly to encompass the area where the effect of the merger will be direct and immediate; (2) must take into account the local nature of the demand for bank services; and (3) must strike a reason-

**153.** P.L. 96–221.

able compromise "to delineate the area in which bank customers that are neither very large nor very small find it practical to do their banking business." *Id.* at 667–68, 94 S.Ct. at 2796; *United States v. Philadelphia National Bank,* 374 U.S. 321, 358–61, 83 S.Ct. 1715, 1738–1740, 10 L.Ed.2d 915 (1963).

■ In the case at bar, plaintiff alleged three geographic markets in support of its potential competition theory: Atlantic County; the Philadelphia Federal's Atlantic City market; and the Philadelphia Federal's Hammonton market. South, the acquired firm, markets its services throughout each of these markets. The government limited its case to locally–limited banking customers and established to the court's satisfaction that such customers can practicably turn to other banks throughout each market for alternative banking services. Moreover, the Philadelphia Federal used reasonable criteria to ascertain the attributes of local banking and the extent of economic and social integration in the Atlantic City and Hammonton markets. Although the court recognizes that the alleged markets may be arbitrary at the margins, especially with respect to the Atlantic County market which is based on growth projections in the area, it finds that the government has carried its burden of coming "forward with evidence delineating the rough approximation of localized banking markets mandated  .  .  ." by the Supreme Court precedents. *United States v. Connecticut National Bank,* 418 U.S. 656, 669–70, 94 S.Ct. 2788, 2796–97, 41 L.Ed.2d 1016 (1974).[154]

Plaintiff, however, did not carry its burden with respect to defining the proper market within which to assess the effects of the proposed merger under a direct competition theory. It alleged the same three geographic markets for both potential and direct competition theories notwithstanding the difference in focus between the legal standards for each. The acquiring bank, Bancorporation, and the acquired bank, South, compete directly only in a narrow strip along the White Horse Pike between Hammonton and the Garden State Parkway. Only in this area would the effect of the merger on locally–limited customers be direct and immediate. The markets alleged by plaintiff under an actual competition theory are overly broad and fail to follow the Supreme Court's instructions that the relevant markets reflect the area of competitive overlap between the acquired and the acquiring bank. For these reasons, plaintiff's direct competition case fails.[155]

## B.  DIRECT COMPETITION

■ Assuming *arguendo* that the geographic markets alleged by plaintiff in its actual competition case conform to Supreme Court guidelines and thus reflect the area of competitive overlap where the effects of the merger would be direct and immediate, the legal standard for assessing the competitive effects of the proposed transaction is clear:

> [A] merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market, is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects.

*United States v. Phillipsburg National Bank,* 399 U.S. 350, 366, 90 S.Ct. 2035, 2045, 26 L.Ed.2d 658 (1970); *United States v. Philadelphia National Bank,* 374 U.S. 321, 363, 83 S.Ct. 1715, 1741, 10 L.Ed.2d 915 (1963).

154.  *See* notes 62 to 78 and accompanying text, *supra.* Plaintiff apparently intends to rely on the same markets for the purpose of evaluating the effects of the proposed merger under an entrenchment theory. It offered no case law in support of this course of action.

155.  *See* notes 58 to 61 and accompanying text, *supra.* One consequence of plaintiff's failure to offer a geographic market which reflects the area of competitive overlap and where the effects of the merger would be immediate and direct is that plaintiff's proofs in the direct competition case do not address the extent of concentration in the geographic market chosen by the court.

In *Phillipsburg*, the Court found that a proposed merger between the third and fifth largest banks in the relevant market, holding 11.2% and 8.1% of market share respectively, would be inherently likely to lessen competition substantially, 399 U.S. at 367, 90 S.Ct. at 2045. Similarly, in *Philadelphia National Bank*, the Court enjoined a proposed merger between the second and third largest of the 42 commercial banks in the relevant market, finding that the merger, which would result in a single bank's controlling at least 30% of the commercial banking business, threatened to produce "undue concentration." 374 U.S. at 364, 83 S.Ct. at 1742. In neither *Phillipsburg* nor *Philadelphia National Bank* did the defendant banks rebut the inherently anti–competitive tendencies manifested by the market share and market concentration figures. 399 U.S. at 367–68, 90 S.Ct. at 2045; 374 U.S. at 366, 83 S.Ct. at 1743.

In the instant case, accepting for the moment plaintiff's alleged geographic markets, the proposed merger would unite the first and seventh largest banks in each of these markets.[156] The resulting bank would hold 44.7% of the Atlantic County, 46.1% of the Atlantic City, and 42.1% of the Hammonton markets. The concentration ratio would increase 2.7% in the Atlantic County, 2.2% in the Atlantic City, and 4% in the Hammonton markets.[157] In light of the precedents discussed above, the merger between these direct competitors would produce a firm controlling an undue percentage share of the relevant market and result in a significant increase in concentration ratio and, therefore, without more, should be enjoined.

■ However, the defendant banks in this case have proposed to divest all the offices of FNSB–West in the relevant markets as well as two offices of South in the Atlantic City market to rebut any anti–competitive tendencies manifested by the merger. The effect of the proposed divestitures, required by the Comptroller as a con-

dition precedent to the consummation of the merger, will be to eliminate any direct competition between FNSB–West and South, and decrease immediately the concentration ratios and increase immediately the number of banking options in each of the relevant markets. Notwithstanding plaintiff's assertion that such divestitures will not achieve their purpose, the court finds otherwise.[158] Moreover, "[d]ivestiture prior to merger is an acceptable technique to avoid an antitrust violation." *Federal Trade Commission v. Atlantic Richfield Co.*, 549 F.2d 289, 299 (4th Cir. 1977). *See also United States v. Atlantic Richfield Co.*, 297 F.Supp. 1061, 1068–69 (S.D.N.Y.1969), *aff'd sub nom. Bartlett v. United States*, 401 U.S. 986, 91 S.Ct. 1233, 28 L.Ed.2d 527 (1971).

## C. POTENTIAL COMPETITION

■ Plaintiff also challenges the proposed merger as likely substantially to lessen competition in commercial banking within the Atlantic County, Atlantic City, and Hammonton markets under actual and perceived potential competition theories. Both of these potential competition theories stress the competitive effects of entry by a competitor which previously had no significant presence in the relevant markets. Actual potential competition theory, however, focuses on a potential entrant's choice to enter a market by a geographic extension merger which might have less of a pro–competitive effect than a *de novo* or toehold entry, while perceived potential competition theory centers on whether a geographic extension merger will eliminate an existing pro–competitive effect exerted by a potential competitor on the fringe of the relevant markets. *See United States v. Marine Bancorporation*, 418 U.S. 602, 623–26 and n.28, 94 S.Ct. 2856, 2870–2872 and n.28, 41 L.Ed.2d 978 (1974). The latter type of potential competition theory has been sanctioned by the Supreme Court, *see, e. g., United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973); the former has not. *See, e. g.,*

---

**156.** Ix 50, 51, 52.

**157.** *Id.*

**158.** *See* notes 79 to 86 and accompanying text, *supra.*

*United States v. Marine Bancorporation,* 418 U.S. 602, 625–26 n.28, 94 S.Ct. 2856, 2871–2872 n.28, 41 L.Ed.2d 978 (1974).

■ In any case, causes of action based on actual– and perceived–potential competition theories share common elements. Potential competition doctrine, in general, comes into play

> only where there are dominant participants in the target market engaging in interdependent or parallel behavior and with the capacity effectively to determine price and total output of goods or services. If the target market performs as a competitive market in traditional antitrust terms, the participants in the market will have no occasion to fashion their behavior to take into account the presence of a potential entrant. The present pro–competitive effects that a perceived potential entrant may produce in an oligopolistic market will already have been accomplished if the target market is performing competitively. Likewise, there would be no need for concern about the prospects of long–term deconcentration of a market which is in fact genuinely competitive.

*United States v. Marine Bancorporation,* 418 U.S. 602, 630–31, 94 S.Ct. 2856, 2874, 41 L.Ed.2d 978 (1974). Another precondition to the applicability of potential competition theory is that "the number of potential entrants is not so large that the elimination of one such entrant would be insignificant." *United States v. Falstaff Brewing Corp.,* 410 U.S. 526, 534 n.13, 93 S.Ct. 1096, 1101 (1973); *Federal Trade Commission v. Procter & Gamble Co.,* 386 U.S. 568, 581, 87 S.Ct. 1224, 1231, 18 L.Ed.2d 303 (1967). If there are many potential entrants, the pro–competitive effects associated with *de novo* or toehold entry (in an actual potential competition case), or with the presence of the entrant on the fringe of the market (in a perceived potential competition case) would be supplied by an entity other than the acquiring company.

■ With respect to the first precondition mentioned above, *i. e.,* that the relevant market is not presently competitive, once the government introduces quantitative evidence indicating that the market is concentrated, the burden of proof shifts to defendants "to show that the concentration ratios, which can be unreliable indicators of actual market behavior . . . did not accurately depict the economic characteristics of the . . . market." *United States v. Marine Bancorporation,* 418 U.S. 602, 631, 94 S.Ct. 2856, 2874–2875, 41 L.Ed.2d 978 (1974). Further, defendant must establish the absence of parallel behavior in pricing or providing of commercial bank services. *Id.* at 631–32, 94 S.Ct. at 2874–2875.

The government, in this case, carried its initial burden and demonstrated that the concentration ratios in the relevant markets were very high. However, defendants also carried their burden. The structural changes that have taken place in the market over the past decade, the presence of competitive behavior and performance by area banks, the competitive effects attending changes in banking laws, and the complete absence of non–competitive or parallel behavior or performance in the markets establishes that the markets are presently competitive and thus ineligible for the application of potential competition theory.[159]

Moreover, there is a substantial pool of potential banking entrants into the relevant markets such that the loss of Bancorporation is an insignificant competitive event. Given the growth that has occurred and is expected to continue in Atlantic County, the largest state–wide banking organizations and numerous regional banks situated on the fringe of the market will fulfill whatever competitive responsibilities Bancorporation once held. Finally, the divestitures ordered by the Comptroller will provide an incentive for some of these banks to enter the markets immediately.[160]

### D. ACTUAL POTENTIAL COMPETITION

■ In addition to the preconditions to the applicability of potential competition

---

159. *See* notes 87 to 116 and accompanying text, *supra.*

160. *See* notes 117 to 121 and accompanying text, *supra.*

doctrine in general, plaintiff must establish before invoking actual potential competition theory that feasible alternative methods of entry in fact existed and that the alternative means offer a reasonable prospect of long–term structural improvements or other benefits in the target markets. *United States v. Marine Bancorporation*, 418 U.S. 602, 638–39, 94 S.Ct. 2856, 2878, 41 L.Ed.2d 978 (1974). In *Marine Bancorporation*, the court found that high regulatory barriers made infeasible *de novo* entry into the target market by the acquiring bank. New Jersey, however, has liberal branching laws, and Bancorporation has the financial and managerial capability and economic motive to expand by means other than merger within the relevant markets.[161]

Although feasible alternative methods of entry exist, if Bancorporation were to enter or expand within the relevant markets by these means, the markets probably would not experience long–term structural improvements. Some benefits could be expected, but these could not be termed "improvements" in a relative sense because the transaction as approved by the Comptroller will have immediate pro–competitive effects which overshadow in quality and quantum those attending the expansion of Bancorporation within the markets at some time in the future.[162] Indeed, the government is in the anomalous position of opposing a merger which will introduce immediately as many as four new entrants into what it terms a concentrated market in reliance on alternative means of expansion which appear unlikely to have a more pro–competitive effect than the proposed merger and which, in any case, probably will occur three or four years down the line.

### E. PERCEIVED POTENTIAL COMPETITION

■ Besides the preconditions regarding the competitiveness of and the number of potential entrants into the target markets, perceived potential competition doctrine can be applied only if "the acquiring firm has the characteristics, capabilities, and economic incentive to render it a perceived potential *de novo* entrant, and if the acquiring firm's premerger presence on the fringe of the market in fact tempered oligopolistic behavior on the part of existing participants in that market." *United States v. Marine Bancorporation*, 418 U.S. 602, 624–25, 94 S.Ct. 2856, 2871, 41 L.Ed.2d 978 (1974). In the most instructive case on perceived potential competition theory, *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973), the Court held that the *intent* to enter of the acquiring company's management was relatively insignificant to the issue whether the company should be considered a perceived potential entrant: the important question is whether, given its financial capabilities and conditions in the market, "it would be reasonable to consider it a potential entrant . . .." *Id.* at 533, 93 S.Ct. at 1101. Moreover, the Court indicated a willingness to rely solely on circumstantial evidence to determine whether the acquiring firm tempered oligopolistic behavior on the part of existing market participants. *Id.* at 534 n.13, 93 S.Ct. at 1101 n.13. *See also Federal Trade Commission v. Procter & Gamble Co.*, 386 U.S. 568, 581, 87 S.Ct. 1224, 1231, 18 L.Ed.2d 303 (1967). Thus, "considerable influence" on the market can be inferred where, in addition to the preconditions discussed earlier, market behavior is influenced by each firm's predictions of the market behavior of its competitors, barriers to entry are insignificant, and the acquiring firm is the most likely entrant. *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 534 n.13, 93 S.Ct. 1096, 1101 n.13, 35 L.Ed.2d 475 (1973).

Clearly, Bancorporation, whatever its actual intent with respect to market entry, has the characteristics, capabilities, and economic incentive to render it a perceived potential entrant. The largest bank in the state, as measured by deposits, it has had extensive experience in branching and in

---

**161.** *See* notes 122 to 127 and accompanying text, *supra*.

**162.** *See* notes 128 to 130 and accompanying text, *supra*.

toehold acquisitions, and it is committed to becoming a state–wide banking organization. Bancorporation has been very active in soliciting large wholesale accounts from the casinos in Atlantic City. Several witnesses testified that they perceived Bancorporation as the most likely entrant into Atlantic County. Under these circumstances, it is reasonable to consider Bancorporation a potential entrant into the relevant markets.

Although there was no credible, direct evidence that Bancorporation's presence on the fringe of the market in fact tempered the behavior of market participants, circumstantial evidence on a level deemed adequate by the Supreme Court in *Falstaff Brewing Corp.* is present here. Bancorporation was the most likely entrant into the relevant markets. Barriers to *de novo* or toehold expansion are relatively insignificant in New Jersey. Finally, the evidence indicated that market behavior is influenced by each firm's predictions of the intentions of its actual and potential competitors. Thus, assuming that the market is concentrated and that there are only a limited number of potential entrants, the elements of a Section 7 violation are present.

## F. ENTRENCHMENT

■ Plaintiff also proceeds under an entrenchment antitrust theory. Entrenchment occurs "[w]here an acquiring firm's market power, existing capabilities, and proposed merger partner are such that the merger would produce an enterprise likely to dominate the target market . . .." *United States v. Marine Bancorporation,* 418 U.S. 602, 623 n.23, 94 S.Ct. 2856, 2870, 41 L.Ed.2d 978 (1974). *See also Federal Trade Commission v. Procter & Gamble Co.,* 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967). A merger which substitutes a powerful acquiring firm for a small but already dominant firm in the relevant market raises barriers to new entry. *Id.* at 578–79, 87 S.Ct. at 1230. Thus, smaller firms are dissuaded from aggressively competing with the newly–formed, giant competitor. *Id.* at

578, 87 S.Ct. at 1230. The oligopoly becomes more rigid. *Id.*

■ As a matter of law, the applicability of entrenchment theory to commercial banking is questionable. Each case in which this theory has been successfully applied involved advertising intensive industries, packaged consumer goods, and limited supermarket shelf space in unusually structured lines of commerce. *See Federal Trade Commission v. Procter & Gamble Co.,* 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967); *General Foods Corp. v. Federal Trade Commission,* 386 F.2d 936 (3d Cir. 1967), *cert. denied,* 391 U.S. 919, 88 S.Ct. 1805, 20 L.Ed.2d 657 (1968). The rationale of those cases is inapplicable to the business of banking, where federal and state banking authorities regulate entry into and exit from the business. The court declines to extend this doctrine to include such a regulated industry as banking.

Moreover, the facts of the case illustrate that there is no danger of entrenchment in the relevant markets. The markets are presently competitive, and numerous parties have sought to enter the relevant markets since the announcement of the proposed merger. Furthermore, Bancorporation is not likely to dominate the relevant markets. Two of the largest banks in the state, Heritage Bancorporation and Midlantic Banks, Inc., have recently entered the geographic markets and promise to provide Bancorporation with significant competition. Indeed, Midlantic, the state's largest commercial bank, by earnings, has competed successfully with Bancorporation throughout New Jersey. Finally, the financial barriers to entry are low, and the regulators would permit entry precisely in those areas where entrenchment threatened to occur.[163]

## G. CONVENIENCE AND NEEDS DEFENSE

■ The Bank Merger Act of 1966 requires the court to engage in a two–step process, the first of which was to decide

---

**163.** *See* notes 135 to 139 and accompanying text, *supra.*

whether the proposed merger violates the antitrust prohibitions of § 7 of the Clayton Act.[164] *United States v. Phillipsburg National Bank*, 399 U.S. 350, 353, 90 S.Ct. 2035, 2038, 26 L.Ed.2d 658 (1970). If the court finds that § 7 would be violated by the merger, the Bank Merger Act requires a determination whether "the anticompetitive effects of the proposed transaction are clearly outweighed by the probable effect of the transaction in meeting the convenience and needs of the community to be served." 12 U.S.C. § 1828(c)(5)(B). The burden of proving this defense rests with defendants and intervenor, and given the obvious adverse social effects of an anti–competitive merger, the burden is heavy. *United States v. First City National Bank of Houston*, 386 U.S. 361, 366, 87 S.Ct. 1088, 1092, 18 L.Ed.2d 151 (1967). Moreover, "before a merger injurious to the public interest is approved, a showing [must] be made that the gain expected from the merger cannot reasonably be expected through other means." *United States v. Third National Bank in Nashville*, 390 U.S. 171, 190, 88 S.Ct. 882, 893, 19 L.Ed.2d 1015 (1968). *Accord, United States v. Phillipsburg National Bank*, 399 U.S. 350, 372, 90 S.Ct. 2035, 2047, 26 L.Ed.2d 658 (1970). Finally, a convenience and needs defense must benefit "all seekers of banking services in the community," rather than some of them. *United States v. Phillipsburg National Bank*, 399 U.S. 350, 372, 90 S.Ct. 2035, 2048, 26 L.Ed.2d 658 (1970).

Assuming that this court had found a violation of § 7, defendants have not established a convenience and needs defense. They failed to show that the influx of credit which can be expected from the mergered entity was unavailable through alternative means. Similarly, the introduction of more aggressive management to South could be achieved by means other than merger. A CDC could be established by any bank in the relevant market. There was no showing that the competitors which would enter the market through the divested office could not enter the market *de novo* or through a toehold acquisition.[165] The defendants simply have not met the additional heavy burden placed upon them by statute and Supreme Court precedent of establishing that the assumed anti–competitive effects of the merger *clearly* outweigh the effect of the transaction in meeting the convenience and needs of the community.

## IV

### CONCLUSION

The court believes that the merger as conditioned by the Comptroller would be pro–competitive and thus not violative of § 7 of the Clayton Act.

The foregoing represents the findings of fact and conclusions of law of the court as required by Rule 52(a) of the Federal Rules of Civil Procedure. Judgment is for no cause of action. Defendants will submit promptly an order consistent with this opinion.

---

**164.** *See* note 1, *supra*.

**165.** *See* notes 140 to 149 and accompanying text, *supra*.