**UNITED STATES of America, Plaintiff,**

v.

**CENTRAL STATE BANK; State Savings Bank; and Harry C. Calcutt, Defendants.**

**No. G82–72 CA.**

United States District Court, W.D. Michigan, S.D.

Aug. 15, 1985.

See also 564 F.Supp. 1478.

Robert E. Hauberg, Rebecca P. Dick, Julia L. Akins, John Dorsey, Andrew C. Gilbert, Dept. of Justice, Antitrust Div., Special Regulated Industries Section, Washington, D.C., for plaintiff.

Thomas J. McNamara, Jeffrey O. Birkhold, Warner, Norcross & Judd, Grand Rapids, Mich., Jack E. Boynton, Murchie, Calcutt & Sondee, Traverse City, Mich., for defendants.

## OPINION

BENJAMIN F. GIBSON, District Judge.

This action was filed by the Government alleging that the joint control of Central State Bank and State Savings Bank by Mr. Harry C. Calcutt violates section 1 of the Sherman Act, 15 U.S.C. § 1.[1] The two banks have long competed for business in Benzie County, a small, rural community in northern Michigan. Of the 371 commercial banks in Michigan in 1984, State Savings ranked 319th and Central State ranked 321st in terms of total deposits. Mr. Calcutt, who was president, chairman of the board and the majority shareholder at State, obtained control of Central in February 1979. The Government's contention is that Mr. Calcutt and others conspired to obtain control of Central and used that control to suppress competition between the two banks.

Trial of this matter took place from November 6 to November 28, 1984. Six witnesses testified for the Government and six witnesses testified for the defendants. Eighty-three Government exhibits and fifty-five defense exhibits were admitted. This Opinion constitutes the Court's finding of facts and conclusions of law, pursuant to Fed.R.Civ.P. 52(a).

### Theories of the parties

The Government's theory is that Mr. Calcutt secretly sought to purchase a majority of Central's shares in early 1976. At that time, Central had begun to reverse its poor financial position and to increase its market share within Benzie County, posing a greater threat to the position of State Savings Bank, which was already controlled by Mr. Calcutt. The Government alleges that Mr. Calcutt and State Savings Bank conspired with others for this purpose, most notably John Nickum. The Government alleges that the conspiracy existed from 1976 to February 1979, when Mr. Calcutt succeeded in obtaining a majority interest and further succeeded in inserting his proposed slate of directors on Central's board. The conspiracy is alleged to have continued through the time of the trial between Mr. Calcutt and the two banks in an effort to curtail competition between State and Central. Removal of competitive measures between the two banks is contended by the Government to have caused a restraint of trade in Benzie County within the relevant market for banking products and services.

The defendants' position is that Mr. Calcutt's motive in obtaining control of Cen-

---

1. 15 U.S.C. § 1 provides in relevant part:
 Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal...

tral was to improve the condition of the bank. He did it secretly, using Mr. Nickum as a proxy, because the prevailing sentiment of Central's board was antagonism toward Mr. Calcutt, several members being ex-State Savings employees. A large block of shares was initially available to Mr. Calcutt in 1976, which he purchased at a good price. He bought roughly a 20% interest for just over $190,000.00. Subsequently, he sought to protect his investment by improving Central's condition, this being possible only through Mr. Calcutt's control of the bank.

The defendants further contend that the erosion of Central's performance from 1979, subsequent to Mr. Calcutt's taking control, to 1984 is due to the policies of former management, rather than to curtailment of competition. Moreover, the defendants' position is that the Court must look beyond Benzie County to determine whether any anticompetitive effects have occurred from Calcutt's joint control of Central and State. In this regard, Central and State customers can turn to banks within the five-county region of northeastern Michigan for banking services. Traverse City, which is 35 miles from Central, is the largest city in the five-county area and is the business, employment and cultural hub of the region. The defendants identify Traverse City as being a particularly reasonable and convenient alternative to Benzie County banks in the event that adverse consumer effects occur in Benzie County. Therefore, Central and State customers are not significantly harmed by any negative consumer effects caused by Calcutt's joint control.

## FACTS

### Background

Mr. Calcutt has owned a majority interest of State Savings Bank's stock since 1970. He is President and Chairman of the Board of Directors at State. Mr. Calcutt took control of Central State Bank at Central's February 13, 1979 shareholders meeting. From 1976 through February 1979, Mr. Calcutt engaged in a series of purchases of Central stock, and by February 13, 1979 he controlled a 45.34%.[2] At the annual shareholders meeting held on February 13, 1979, Mr. Calcutt's proposed slate of directors was elected to Central's board.[3]

It is undisputed that State and Central competed prior to February, 1979. Both banks are located in Benzie County, Michigan, eight miles from each other. State is in the town of Frankfort; Central is in Beulah. In 1979, there were four banks in Benzie County.

Benzie County is a small, rural county in northwestern Michigan which has a population of 11,205. It contains seven towns or villages. Frankfort, where State is located, has a population of 1,603; Beulah, where Central is located, has a population of 466. The economy of Benzie County consists mainly of agriculture, tourism and, to a lesser extent, small retail business.

At the time Mr. Calcutt acquired control over Central, the economy in Benzie County was depressed. Its major employer, the Ann Arbor Railroad, which operated a car ferry employing as many as 300 people at one time, ceased operations in 1979. The unemployment rate has averaged 16.2%

---

2. On February 13, 1979, Central had 48,000 shares of stock outstanding. On that day, Mr. Calcutt owned 18,090 (37.6%); Harvey L. Calcutt—one of his son's—owned 300 shares (.63%); Harry C. Calcutt—another son—owned 180 shares (.48%); Northwestern Savings and Loan Association Deferred Compensation Plan—of which Mr. Calcutt was a Trustee—owned 2,400 shares (5%); DeBruyn Concrete Products Company Profit Sharing Trust—of which Mr. Calcutt was a Trustee—owned 480 shares (1%); and Murchie and Calcutt Employ-

ees Retirement Fund—the retirement program at Mr. Calcutt's law firm—owned 300 shares (.63%). The total percentage of outstanding shares controlled by Mr. Calcutt on that date was 45.34%. At the time of the trial in this matter, Mr. Calcutt owned a 50.55% interest in Central.

3. Of the 48,000 shares outstanding, 89.1% voted in favor of Mr. Calcutt's proposed slate of directors.

from 1978 to 1983, and in March 1983 unemployment stood at 35.4%.[4]

Benzie County banks

In 1979, when Mr. Calcutt acquired a controlling interest in Central State Bank, there were four banks in Benzie County. Each had only one banking office, except Central which had a branch located near its main office.

State Savings Bank is in Frankfort, the largest town in the county in terms of population. Central is in Beulah, the second largest town, located eight miles west of Frankfort. The Honor State Bank is in Honor, the third largest Benzie County town, five miles northeast of Beulah. In 1977, Michigan National Bank—Grand Traverse, which is headquartered in Traverse City, opened a branch in Benzonia, which borders the southern edge of Frankfort.

The record reflects that from 1977 to 1979, Central was the largest bank in Benzie County, both in terms of total deposits (*1977:* $14,721,000; *1978:* $15,943,000) and market share of total deposits (*1977:* 36.42%; *1978:* 34.69%).[5] In 1979, Honor State Bank became the largest Benzie County bank, having total deposits of $15,031,000 and a market share of 30.34%. In 1979, Central's total deposits fell to $14,862,000, and its market share fell to 30%.[6] Although Central's total deposits remained constant, its market share steadily decreased each year, and stood at 22.18% in 1984.[7]

State Savings Bank was the second largest bank in the county from 1977 to 1979 when it became the third largest, having total deposits of $13,136,000 and a market

share of 26.52% in 1979. Its market share fell in 1980 to 25.72%, and in 1981 to 24.88%. However, in 1982 State again became the second largest bank in the county with total deposits of $16,019,000 and a market share of 27.04%. Although State's market share decreased in 1983 to 25.91%, and in 1984 to 25.46%, it maintained its ranking through those years.[8]

Honor State Bank has grown steadily from 1977 through 1984, increasing its total deposits from $11,928,000 to $24,041,000 and its market share from 29.52 to 32.48% during those years. Michigan National Bank's Benzonia branch has also grown steadily during this period, increasing its total deposits from $1,247,000 in 1977 to $7,926,000 in 1983, and increasing its market share from 3.09% to 12.41% during this period. However, in 1984, its total deposits fell to $7,802,000, and its market share fell to 10.54%.[9]

In May 1983, a newly chartered Benzie National Bank opened in Benzonia. In that year Benzie National had deposits totalling $1,556,000 and a market share of 2.44%. In 1984, it had deposits totalling $1,850,000 and a 2.50% market share.[10] Benzie National also maintains a loan production office and an automated teller machine in Beulah.[11]

Interchange with Grand Traverse County

The record reflects that Benzie County residents, as well as many residents from neighboring counties, travel to the Traverse City area to work, shop and attend social and cultural events. Based on statistics compiled from 1980 census data, 17.2% of Benzie County residents are employed in

4. These figures were cited by Commissioner Eugene W. Kelly of the Financial Institutions Bureau of the Michigan Department of Commerce in his opinion in *In the Matter of Central State Bank,* June 23, 1983. (Defendant's exhibit WW)

5. Government exhibit 402(d), which reflects total deposits and market shares of Benzie County banks from 1977 through 1984. This data is derived from the Federal Deposit Insurance Corporation Summary of Deposits Report for each of those years.

6. *Id.*

7. *Id.*

8. *Id.*

9. *Id.*

10. *Id.*

11. Testimony of Dr. Paul Horvitz, the Government's economics expert, Tr. 1001–1002.

Grand Traverse County.[12] With respect to the other three counties which border Traverse County, 47% of Leelanau County residents, 11% of Kalkaska County residents, and 11.5% of Antrim County residents are employed in Grand Traverse County.[13]

Frankfort, where State Savings Bank is located, is approximately forty miles from Traverse City; Beulah, where Central State Bank is located is approximately thirty-two miles from Traverse City.

In February and March of 1983, the Traverse City-Record Eagle conducted a market study that revealed the degree to which people in Benzie County shop in Grand Traverse County.[14] Of the people in Benzie County who do their grocery shopping at one store (33%), 31 percent shop at Meijer's Thrifty Acres in Traverse City. Of the people in Benzie County who do their grocery shopping at two or more stores (67%), 28 percent use a Grand Traverse store as their primary food source and 41 percent use a Grand Traverse store as their secondary food source.[15] The market study also found that 44% of those polled indicated that their most recent purchase of men's clothing was made in Traverse City; 34% said their most recent purchase

of woman's clothing was made in Traverse City; and 23% said their most recent purchase of children's clothing was made in Traverse City.[16]

In 1982, there were four commercial banks in Traverse City: National Bank of Detroit—Northwest Bank, which is owned by the largest bank holding company in Michigan; Michigan National Bank—Grand Traverse, which is owned by the second largest bank holding company in Michigan; Old Kent Bank —Grand Traverse, which is owned by the sixth largest bank holding company in Michigan;[17] and Empire National Bank. Northwestern Savings and Loan is also located in Traverse City. The record reflects that there is another commercial bank and another savings and loan institution outside of Traverse City but within Grand Traverse County; Cadillac State Bank (Fife Lake) and United Federal Savings and Loan.[18]

Benzie accounts held by Grand Traverse financial institutions: the Traverse City factor.

In 1982, Benzie County residents maintained accounts totalling $86,931,172.75 in *all* banks.[19] Of this total, $15,511,161.00

12. Defendants' exhibit ZZ. These statistics were compiled by Data Research Center, Inc. (Traverse City, Michigan).

13. *Ibid.*

14. The results of this study are set forth in full at defendants' exhibit PP, and are summarized at defendants' exhibit OO. The study consisted of 400 telephone interviews of people residing in Benzie, Antrim, Leelanau, Kalkaska, and Grand Traverse Counties. The interviewees were selected in a statistically valid, random manner, with the number from each county being in the same proportion to the counties' populations. Data Research, Inc., assisted in the study, and its results are accurate to within 5 percent.

15. Defendants' exhibit OO, p. 3.

16. *Id.*, pp. 8–11. The market study does not reflect the locations of the stores the respondents identified in the poll. The poll results only indicate the store names. The locations of the stores were provided by the direct testimony of Mr. Orrin B. Robbins, the president and publisher of the *Record Eagle,* and a resident of

Traverse City. (*See* Trial Transcript pp. 1721–1723.)

17. Old Kent Financial Corporation acquired the Pacesetter Bank in 1984 to establish a market presence in Traverse City. Pacesetter had previously acquired the Traverse City State Bank, which was the existing bank in 1979.

18. *See* Defendants' exhibit BB, reflecting accounts of Benzie County residents held by Grand Traverse County banks.

19. The data from which this figure is derived, as well as virtually all other figures relating to the amounts of the accounts of the various banks and the residences of bank customers, is compiled in Government exhibit 343, referred to in the trial as "zip code data." The Government's economic expert testified at trial that banks maintain zip code data to determine where their customers live. (*Tr.* 1090–1091)

Government exhibit ("GX") 343 indicates for each bank in Benzie, Leelanau, Grand Traverse, Antrim and Manistee counties the number of accounts held by customers residing in each zip code within those five counties. In addition to the number of accounts from each zip code,

(or 17.84% of all Benzie accounts) was maintained in Traverse City financial institutions.[20] Excluding accounts held by Benzie residents at Northwestern Savings and Loan, the dollar amount of Benzie accounts held by Traverse City commercial banks in 1982 was $13,035,949 (or 15% of all Benzie accounts).

If the two financial institutions outside Traverse City but within Grand Traverse County are included, Benzie residents had accounts in Grand Traverse County totaling $16,273,299.00 (or 18.72% of all Benzie accounts).[21] Excluding the two savings and loan institutions, and looking only at the commercial banks in Grand Traverse County, the banks in Grand Traverse County hold $13,068,368.00 in Benzie residents' accounts (or 15.03% of all Benzie accounts).[22]

The record further reflects that Benzie County residents maintained accounts in financial institutions other than those in Benzie and Grand Traverse Counties. An additional $4,393,048 (or 5.05% of all Benzie accounts) in accounts were held by Benzie residents in institutions in Leelanau, Kalkaska and Antrim counties.[23] The total dollar amount of accounts of Benzie residents held in banks and savings and loan institutions outside Benzie County but within the five-county region in 1982 was $20,666,347.00 (or 23.77% of all Benzie accounts). Excluding the savings and loans, the total dollar value of Benzie accounts in banks outside Benzie but within the five-county area is $14,599,038 (or 16.79% of all Benzie accounts).[24]

It is clear from these figures that Grand Traverse County provides a strong attraction to Benzie County residents for employment, shopping and banking. Although they have to travel 35 to 40 miles to Traverse City, the record reflects that a substantial portion of Benzie County residents do so on a regular basis. It is also reasonable to infer that many Benzie County residents shop and bank in Grand Traverse County because they commute there daily for work, as do many residents from the three other surrounding counties. It is also clear to the Court that Grand Traverse County attracts, by far, more residents from Leelanau, Kalkaska and Antrim counties for work, shopping and banking.

Bank products offered in five-county market

There was no attempt made at the trial to separate and identify each discrete product offered at each bank in the five-county area. The vice-president of State Savings Bank, Irvin R. Cabot, did testify as to the

---

GX343 also indicates the percentage of each bank's total accounts (by number of accounts), the dollar amount, the percentage of each bank's total accounts (by dollar amount), and the average size of accounts held by residents within each zip code in the five-county area.

This data was compiled for savings and loan institutions as well as banks in the five-county area, and serves as underlying data for many of the documents admitted into evidence reflecting account information introduced by both parties. The Court notes that the zip code data was compiled using bank and savings and loan records as of 1982.

There are 37 zip codes in the five-county area. The Court notes that a fraction of the accounts in the banks did not live in the five-county area, or did not have their address on file with their financial institution. (*See* Horvitz, Tr. 1094–1096.) These accounts are identified in GX343 by zip code "99999," and were not of consequence to the parties in this case.

**20.** This figure is derived from adding the total loans and total deposits held in Traverse City by

Benzie residents (Defendant's exhibits Z, AA) and dividing that by the total dollar amount of accounts held by all Benzie residents.

It appears from the entire record that Cadillac State Bank (Fife Lake) and United Federal Savings and Loan are included in defendant's exhibit AA as being located in Traverse City. The Court has excluded the deposit amounts in exhibit AA from its calculation of Benzie accounts held by Traverse City banks. These two institutions are inside Grand Traverse County, but outside Traverse City.

**21.** *See* defendant's exhibit BB.

**22.** These figures are computed by using only the commercial bank accounts identified in exhibit BB.

**23.** These figures are derived from exhibit Y, which reflects the total number and dollar value of accounts held by Benzie residents in banks in the entire five-county area.

**24.** *Ibid.*

products offered by State.[25] These include deposit products, loan products, and bank services. The Government made no attempt to refute Mr. Cabot's testimony on this point or to show a substantial difference exists in the products offered by other banks.[26] In any event, it is reasonable to infer that the products offered by State reflect the range of products available at other commercial banks in the five-county area.

The deposit products are:

a. savings accounts,

b. checking accounts,

c. certificates of deposits (in various denominations),

d. money market accounts,

e. negotiable order of withdrawal (NOW) accounts

f. super NOW accounts, and

g. individual retirement accounts.

The loan products are:

a. mortgage loans,

b. commercial loans,

c. personal loans,

d. auto loans, and

e. student loans.

Bank services are:

a. sale of cashier checks,

b. sale of money orders,

c. sale of travelers checks,

d. bank wire transfers,[27]

e. servicing of land contracts, and

f. favorable hours of operation.

**Calcutt's takeover of Central**

Mr. Calcutt undisputedly owned a majority interest in State Savings Bank prior to 1970 and up through the time of the trial. The evidence shows that in January 1976, Mr. Calcutt owned 200 shares of Central State Bank stock. From January 1976 to February 1979, Mr. Calcutt engaged in a pattern of stock acquisitions which resulted in his obtaining a controlling interest in Central State Bank.

On February 13, 1979, Mr. Calcutt owned, directly[28] or beneficially,[29] 23,750 of Central's 48,000 shares outstanding, or 49.48%. It is undisputed that at the time of trial, Mr. Calcutt owned, directly or beneficially, 24,260 shares, or 50.54%.

Mr. Fred Bradford was the president of Central State Bank until his retirement in 1975, and its majority shareholder until 1976.[30] In 1976, Mr. Bradford indicated an interest in selling some shares in order to pay some personal debts.[31] Mr. John Nickum, a retired banker, had previously inquired about the purchase of Central shares, and when the Bradford stock became available Michael Codden, Central's executive vice-president, contacted Mr. Nickum. Mr. Codden testified that Nickum had indicated that "he would like to have an interest in the bank and something to kind of keep his finger in it, give him something to do."[32] However, Mr. Nickum testified at trial that his sole purpose in acquiring the Central shares was to obtain a controlling interest in the bank.[33]

Mr. Nickum bought Bradford's 11,000 shares on January 12, 1976. Having obtained only 23%, Mr. Nickum made a tender

---

**25.** *See* Tr. 1502–1508.

**26.** The Government's position in this case is that the relevant product market is transaction accounts and small business loans, a portion of overall bank products. This may indicate why it made no showing of the overall products available in the five-county area.

**27.** State is the Western Union agent for Benzie County.

**28.** Mr. Calcutt owned 18,090 shares (37.68%) in his name. *See* Government exhibit (GX) 411.

**29.** Relatives of Mr. Calcutt and trusts for which he served as trustee owned a combined total of 5,660 shares (11.79%). *Ibid.*

**30.** Michael D. Codden, the executive vice-president of Central at that time, testified that Mr. Bradford owned 23% of Central's shares. (Tr. 346)

**31.** *See* Codden, Tr. 353.

**32.** *Ibid.*

**33.** *See* Nickum, Tr. 1390.

offer on January 15, 1976 in an attempt to obtain a majority of Central's stock. When the tender offer failed, Mr. Nickum abandoned his bid for control and sought to sell all his Central stock. The market for stock of small banks being a very limited one, Mr. Nickum looked to someone in the banking business, Mr. Calcutt.[34]

On February 2, 1976, Mr. Calcutt and Mr. Nickum entered into an agreement whereby Calcutt would immediately buy 11,120 shares for $189,140.00 (this in addition 1,180 shares previously bought by Calcutt) in exchange for Nickum's promise to use his best efforts over the next two years "to acquire for Harry Calcutt up to 10,000 additional shares."[35]

Over the next three years, Mr. Nickum acquired 4,790 additional shares through various tender offers. These purchases were made in Nickum's name because of the "very antagonistic" attitudes of Mr. Codden and Mr. Donald Wickham, another officer of Central State Bank, toward Mr. Calcutt. There is no dispute that the shares obtained by Calcutt through Nickum were obtained secretly. On January 29, 1979, Mr. Calcutt bought 1,000 more Central shares from E.F. Hutton, thereby completing his acquisition of a majority interest in Central State Bank.

On February 6, 1979, Mr. Calcutt submitted a proposed slate of directors to be voted upon at the February 13 annual meeting of Central's shareholders. On February 12, Central's three officers resigned. At the February 13, 1979 meeting, Mr. Calcutt's slate was overwhelmingly approved with 43,100 shares voting for it, 4,900 voting against it.

Calcutt's motives for control of Central

There is a sharp dispute over Calcutt's motivation for obtaining control over Central State Bank. Mr. Calcutt contends that, initially, he bought the Bradford shares because the price offered by Nic-

kum ($17/share) was an attractive one. Mr. Calcutt testified that after about a year he became uncertain about the direction in which the bank was going. He stated, "I felt I had to have enough stock so I could correct the bank activities."[36] He testified that since no one officer controlled the bank after Bradford's retirement, the officers were "feathering their own nests" with unusual board fees. They were calling committee meetings and collecting $50.00 or $100.00 fees anytime they wanted. Newspaper foreclosure reports signalled loan troubles. He heard rumors about loans to non-creditworthy borrowers.

The Government contends that Mr. Calcutt sought to obtain control of Central to curtail inroads made into the Frankfort market, otherwise controlled by State Savings Bank. The Government alleges that the Elberta branch proposal, formulated in 1978 but abandoned after Calcutt gained control of Central, is some indication of Calcutt's purpose. Had Central established the Elberta branch, it would have established a presence one mile from State Savings Bank. The Government's position is that Mr. Calcutt objected to Central's establishment of an Elberta branch because it threatened State with the loss of even more business.

On October 26, 1978, State filed a formal protest of Central's proposed Elberta branch with the Michigan Financial Institutions Bureau.[37] The protest was signed by Mr. Calcutt. On June 20, 1979, Central's board of directors, now headed by Mr. Calcutt, unanimously withdrew the application to branch into Elberta.

a. Central's pre-1979 performance.

The record reflects that prior to January 1976, Mr. Calcutt owned 200 shares of Central, valued at $3,400.00.[38] On January 29, 1976, he bought 11,120 shares for $189,040.

34. *Id.* Tr. 1397–1398.

35. The Memorandum of Agreement is GX 180.

36. Calcutt, Tr. 1743.

37. GX 99.

38. *See* GX 411, which documents Mr. Calcutt's purchases of Central shares from November 1975 through October 16, 1979.

If Mr. Calcutt developed a personal stake in the future direction of Central, he developed it in January 1976.

The record supports the finding that Central was experiencing substantial financial and managerial problems in 1975.[39] The report of examination prepared by the Michigan Financial Institutions Bureau for 1975 concluded that Central "remains in precarious condition."[40] The examiner concentrated on Central's loan portfolio and credit files, and found that "Classified loans remain high at 37.9% of bank's capital and reserve accounts ...." [41] It appears from the evidence that problem loans were the primary cause of Central's condition in 1975.

Donald Wickham left State Savings Bank in 1975 to join Central at the request of Michael Codden. Mr. Wickham testified as to the efforts used to solve Central's problems. In late 1975, Central charged-off $250,000 in bad debt.[42] Mr. Wickham testified as to many other steps taken by Central, including increased collection efforts, attraction of new accounts, new stock offerings, institution of a "call program,"[43] and Mr. Wickham's use of his position at the Sleeping Bear Dunes Chamber of Commerce to attract business.

The Michigan FIB examiners' report for 1976 states, "The overall improvement in the condition of the bank is recognized. Classified loans ... have decreased from 37.9% to a more acceptable 15.2% ...." [44] However, the report concludes that significant problems remained, including an increase in delinquent real estate loans, a high percentage of non-income producing real estate assets, and a high loan-to-deposit ratio. The Report recommended that the bank institute a securities investment policy.

Central's total assets increased by 5.6% in 1976, to $13,664,449.00.[45] In 1977, Central's total assets increased by 19.9%, to $16,394,851.00.[46] Total assets rose by 10.3% in 1976, to $18,091,200.00.[47] However, the 1977 FIB report of examination notes that Central's classified assets were "an excessive 44.75% of capital structure and reserves," and its capital-to-asset ratio was less than in 1976, having decreased to 6.4%. The examiners concluded this ratio was "well below acceptable standards."[48] Although Central made progress with respect to classified loans in 1976, classified loans as a percentage of reserves rose in 1977 to 29.9%.[49]

In 1978 classified assets were 37% of capital and reserves.[50] The FIB report stated that classified loans were down from 29.9% to 20.8%.[51] These figures were considered to still be too high. Also, Central's 1978 loan-to-deposit ratio of 85% was too high. A maximum of 75% was set for this item by Central's internal policy.

**39.** Donald Wickham, a former loan officer at State who resigned in 1975 to join Central, testified extensively about Central's condition in 1975. (*See* Tr. 93–127).

**40.** *See* Defendant's exhibit C, p. 1.

**41.** *Ibid.* Mr. Wickham testified that these classified loans (problem loans) had "completely eliminated the reserve for bad debts, and have absorbed $57,570.80 of the undivided profit account .... If they [the problem loans] were to materialize into a loss would have used up 57% of the entire capital account." (Tr. 97–98)

**42.** Tr. 106–107. A "charge-off" is an application of money in the bank's reserve account to the loan account which is unpaid.

**43.** This program appears to be a public relations campaign primarily aimed at attracting business customers.

**44.** Defendants' exhibit D, p. 1–1.

**45.** *Id.,* p. 2 (balance sheet).

**46.** Defendants' exhibit E, P. 2–1.

**47.** Defendants' exhibit J (balance sheet).

**48.** *Id.* at p. 1.

**49.** *Ibid.*

**50.** Wickham testified as to this percentage; he was not sure though whether it was 37% or 31%. He eventually said it was about one-third. (Tr. 153)

**51.** Defendants' exhibit F, at p. 1.

It appears from the above that from 1976 when Mr. Calcutt attained a substantial financial stake in the performance of Central, to late 1978, just prior to Calcutt's taking control, Central improved financially. However, it also appears that the regulators still were not satisfied, and that the bank's problems were not all solved. In 1978, Central had excessive classified loans and other assets, and its loan-to-deposit ratio reflected an adverse liquidity position.

The Court cannot determine, based on Central's performance from 1976 to 1978, that Mr. Calcutt's alleged concern for the fate of the bank was pretextual. Moreover, Mr. Calcutt's decision to attempt to obtain control of Central was solidified in February 1976, when he entered the agreement to buy the Bradford shares from Mr. Nickum. Calcutt made this decision just after 1975, the year Central was "facing terrible problems" and in "awful condition."[52] The Elberta branch application was not filed until September 1978.

Central did capture a larger market share during these years, and State did lose a small share of the Benzie market. Central's total assets increased steadily. However, its classified assets and classified loans fluctuated sharply during these years. Though Central remained a bank with problems, its overall financial position clearly improved. This improvement occurred at a time when State's market share was decreasing, albeit slightly, from 27.59% in 1977 to 26.52% in 1979. There is no indication, however, that State was in any financial difficulty. Therefore, this evidence does not support the Government's position that Calcutt's motivation for controlling Central was to curtail its inroads into the Frankfort market.

b. Central's post-1979 performance.

In 1979 and 1980, the first two years Central operated under Calcutt's control, its total assets decreased. In 1979, total assets fell to $1,106,000.00 (6.1%), and in 1980, they fell $878,000.00 (5.1%).[53] Classified loans increased from 29.9% to 65.9% of capital and reserves in 1979, and again increased in 1980. These figures reflect a change in the trend which began in 1976. However, the 1980 FDIC Report of Examination found that the classified loans which existed at that time were almost all borrowed during the time prior management was intact at Central. The 1980 Report states, "It is recognized that the classified loans are almost entirely credits that were originally extended by the previous management, and that present management has put forth considerable effort to work out solutions to these problem situations."[54]

Frank Parkinson, the president of Central since 1983, testified at the trial that Central would presently (1984 fiscal year) enjoy positive earnings but for the charge-offs attributable to bad loans.[55] Mr. Parkinson testified that Central's 1984 losses would be $190,000.00.[56] As of September 1984, Mr. Parkinson projected that Central's 1985 net earnings would be $140,000.00.[57]

The Court concludes that while there is some indication that Central's condition has improved, the evidence clearly shows that Central has declined under Mr. Calcutt's tenure as chairman of the board there. However, the Government has presented no direct evidence that Calcutt intentionally eroded Central's financial position. Moreover, the circumstantial evidence supports the defendants' position that the bad debt which is the most significant cause of that position was incurred by Central's former management.

## ANTICOMPETITIVE EFFECTS

The Government's position is that, in addition to the erosion of Central's financial

---

52. Testimony of Donald Wickham, Tr. 247.

53. Federal Deposit Insurance Corporation's Reports of Examination 1979 (Defendants' exhibit N) and 1980 (Defendants' exhibit O).

54. Defendants' exhibit O, at p. 1.

55. Tr. 1590–1592.

56. Tr. 1654.

57. *See* Projected Budget, GX 45 (last page). *See also* Tr. 1639, where Mr. Parkinson emphasizes that estimates can change day-to-day.

condition, the anticompetitive effects caused by Calcutt's joint control of State and Central between 1979 and 1984 are:

1. Central's withdrawal of Elberta branch application;
2. Central's cessation of solicitation of business in the Frankfort area;
3. Central's termination of membership in Chamber of Commerce;
4. Incipient anticompetitive effect caused by increased market concentration.[58]

The Government's economics expert testified that Central was a less aggressive competitor after 1979.[59] He further testified that those hardest hit by these effects are the "average bank customer or businessman in Benzie County," since the larger bank customers may more easily turn to the Traverse City banks.[60] The Government's expert testified that significant anticompetitive effects exist even though there is no evidence to suggest any effect on the prices of the banks' products.[61]

### 1. The Elberta branch.

Mr. Wickham testified that the Elberta branch would have been able to service 25% of Central's Benzie County customers. In addition to providing greater service to these customers, because Elberta is two miles from Frankfort, Central's management thought an Elberta branch would provide better penetration into the Frankfort market.[62] Also, management thought the Elberta branch would relieve some of the traffic in Central's main office, and could have been built at a low cost.

Mr. Calcutt testified that he withdrew the plan to branch into Elberta because Central had already attracted all the Elberta area customers it could, with or without a branch. Also, Central was not strong enough, financially, to expand.[63]

The defendants have submitted evaluations of the viability of Central's proposed Elberta branch. Dr. Claude Martin, a professor of marketing at the University of Michigan, concluded the branch would be a "poor venture," based on the lack of growth or development there.[64] The Court concludes, however, that the evaluation prepared by Dr. Martin fails to provide a sufficient factual basis for the Court to give much weight to its conclusions. In this regard, the Court is persuaded by Dr. Horvitz's criticisms of the Martin evaluation.[65]

Professor Thomas Gies, a finance professor at University of Michigan, also prepared a report which concluded an Elberta branch "would not gain patronage in a reasonable period of time sufficient to meet the costs of establishing and maintaining such a facility."[66] The Court agrees to some extent with Dr. Horvitz's criticism of the Gies report. The Gies report focuses on the benefit to Central primarily in terms of attracting new customers from the Elberta population, a population of 544. As is noted above, Central sought to provide convenience to existing customers and to attract some Frankfort customers from State, and was less concerned with attracting Elberta customers. The Gies report fails to evaluate these prospects. However, both the Martin and Gies reports concur that Elberta is economically depressed and sparsely populated.

---

**58.** These are the anticompetitive effects described by Dr. Paul Horvitz, the Government's economics expert, in response to a question posed by the Court. *See* Tr. 1364–1367.

**59.** Horvitz, Pr. 1210.

**60.** *Ibid.*

**61.** *Id,* p. 1364–1365. Mr. Horvitz testified that "... with the price information I was able to see, I don't see any evidence in that data that demonstrates the two banks are conspiring to set prices at inordinately high levels or profitable levels."

**62.** Wickham, Tr. 162–164.

**63.** Calcutt, Tr. 1781–1782.

**64.** GX 131 (completed May 8, 1979).

**65.** *See* Tr. 1204–1209.

**66.** GX 126, at p. 16 (prepared February 28, 1979).

The Court can only conclude from the above that the decision not to branch into Elberta caused some inconvenience to those existing Central customers who lived closer to Elberta than to Beulah. The Court notes that Central's main office in Beulah is eleven miles from Elberta. There is testimony that an Elberta branch would be more convenient for 25% of Central's customers.[67] However, this figure is an estimate offered by Mr. Wickham. In addition, it is safe to assume that an Elberta branch would be more convenient to some within that 25% group than others. It is not clear just how much inconvenience to just how many existing Central customers was caused by the withdrawal of the branch application.

There is also testimony that an Elberta branch would provide increased competition for State and Central,[68] and result in Central attracting some State customers.[69] While the Court is willing to find that some Frankfort customers would have been more inclined to look to Central as a more serious alternative if it had an Elberta branch, there is no factual basis in the record from which the Court can determine what number of persons would do so.[70]

2. Cessation of Frankfort business solicitation.

There is no dispute that Central and State competed for Frankfort business prior to 1979. Dr. Horvitz, the Government's economic expert, testified that Central stepped up its competitive efforts for the Frankfort market between 1975 and 1979, the clearest indication being the proposal to branch into Elberta.[71] He also stated that Mr. Neil F. Nugent, a director of Central, testified by deposition that Central stopped

soliciting Frankfort business after Calcutt took control. However, no reference to a particular item in the deposition is made, and the Court's review of the Nugent deposition fails to substantiate Dr. Horvitz's testimony on this point. Dr. Horvitz also testified that both Central and State redrew their Community Reinvestment Act maps, reflecting the exclusion of the area of market overlap.[72]

The record does not contain any direct evidence of the extent to which Central decreased solicitation of Frankfort business under Calcutt's control, if it did so at all.

There is, however, some evidence that Central sought to focus its efforts on resolving the problem of classified loans during the period in question, as opposed to focusing on attracting new deposits. Mr. Frank Parkinson, Central's president, testified that his strategy for growth at Central is to become profitable before seeking to substantially increase total deposits.[73] He also stated that, although State is Central's biggest competitor for deposits, he will continue to give less priority to new deposits.

The Court concludes from the evidence on this point that there was some decrease in Central's attempt to attract Frankfort business after 1979. The Court, again, cannot determine from the record how much. The Court can infer that some decrease resulted when the new management began and the "call program" was dropped. The Court can also infer that some decrease in solicitation resulted from the alleged concentration by new management on the classified loan problem. In all, the Court concludes that while there was some decrease in solicitation efforts in Frankfort, it does not appear that this decrease

---

67. Testimony of Donald Wickham, Tr. 161.

68. See Gies report, GX 126, p. 6.

69. Ibid; see also Horvitz testimony, Tr. 1209.

70. The Court notes based on GX 343 (zip code data) that between 1.0 and 1.5% of Central's customers reside in Elberta; between 8 and 9% of State's customers reside in Elberta.

71. See Tr. 1183–1184.

72. See Tr. 1197. A community Reinvestment Act statement delineates the primary service area of each bank. Federal regulations require that the CSA's be updated annually. See testimony of Robert Isreals, president of Empire National Bank, Tr. 715.

73. See Tr. 1572–1573.

had a significant impact on Frankfort residents' choice of where to bank, or on the competitive atmosphere in Frankfort.

3. Cancellation of Chamber of Commerce membership.

Dr. Horvitz also testified that by cancelling its membership in the Frankfort Chamber of Commerce, Central lost a convenient forum in which to attract new business.[74] There is evidence in the record which supports the claim that participation in such groups "... kept you in constant contac with the local merchants and business people in the area." [75]

There is no evidence as to why Central cancelled its membership. There is clearly no direct evidence that Central lost business as a result of doing so. Based on this, the Court can only conclude that any adverse impact caused by its withdrawal from the Frankfort Chamber of Commerce was minimal.

4. Increase in market concentration.

In each year since 1979, except for 1982, the Benzie County market share has decreased for both Central and State banks. In 1982, State's market share increased by 2.16% over 1981.[76] State's share of the market fell very little, from 26.52% in 1979 to 25.46% in 1984. Central's fell by almost 8% over this period, from 30% in 1979 to 22.18% in 1984.

Despite their declining market shares in the Benzie market, combination of those shares results in an extremely high portion of an already concentrated market.[77] Together, Central and State possessed 56.52% of the Benzie market in 1979; they possessed 47.64% of the Benzie market in 1984.

In 1979, there were two other banks in Benzie County; Honor State Bank had 30.34% of the market, and Michigan National Bank-Grand Traverse's Benzonia branch had 9.61%. Both these Benzie County banks increased their market shares from 1979 to 1984. Honor's market share increased by 2.14% to 32.48%, and Michigan National's Benzonia branch increased its share by .93% to 10.54%.

As was noted above, in 1977 Michigan National's Benzonia branch was established and was located one mile from Central State Bank.[78]

On May 2, 1983, Benzie National Bank was established and set up its home office in Frankfort.[79] From 1983 to 1984, Benzie National's market share increased by 4.4%, from 1.44% to 6.84%. In addition to its Frankfort home office, Benzie National put a loan production office in Beulah, in the same building in which Central's main office is located. It also added an automatic teller machine to its Beulah facility.

## CONCLUSIONS OF LAW

Section 1 of the Sherman Act, 15 U.S.C. § 1, proscribes every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade. The complaint alleges that the defendants and other coconspirators engaged in a contract, combination or concert of action, the purpose of which was to eliminate competition between Central and State banks.

This case is governed by the rule of reason, a fact-sensitive analysis developed by the courts under section 1 which requires the factfinder to decide whether, under all the circumstances of the case, the restrictive practice imposes an unreasonable restraint on competition. *Arizona v. Maricopa County Hospital*, 457 U.S. 332, 337, 102 S.Ct. 2466, 2472, 73 L.Ed.2d 48 (1982); *Chicago Board of Trade v. U.S.*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683

---

74. Tr. 1197.

75. Testimony of Donald Wickham, Tr. 128–129.

76. GX 402(d), derived from FDIC Summary of Deposits Report for each year. Shares represent market shares for total deposits.

77. *Id.* The credit union had 3.53% of the total deposits in Benzie County.

78. Testimony of Donald Wickham, Tr. 188.

79. *Id.,* Tr. 198.

(1918). The rule has been stated by the Supreme Court in this way:

> Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

*Chicago Board of Trade, supra,* 246 U.S. at 238, 38 S.Ct. at 244.

■ The key inquiry under section 1 cases governed by this rule is whether, in the relevant geographic market, the defendants' conduct has produced a restraint of trade in the relevant product market. *U.S. v. Columbia Steel,* 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948). The relevant product market is generally defined as that area of goods and services in which the products offered by the defendants effectively compete. *U.S. v. DuPont,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). The relevant geographic market is generally defined to be the geographic area of effective competition in which the product or services are traded. *DuPont, supra.*

■ The object of section 1 is concerted activity. *Dart Drug Corp. v. Parke Davis*

*Co.,* 344 F.2d 173 (D.C.Cir.1965); VonKolinowski, Antitrust Laws and Trade Regulation, § 7.01[2] (1982). There must be two or more persons or entities taking concerted action to restrain trade in order to find a section 1 violation. *Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968).

■ The requisite intent in § 1 civil cases is only a general intent, that is, that each party acted with the intention that his acts have the consequences they did have, and with the knowledge that at least one other actor would act in conjunction with him. *Interstate Circuit v. U.S.,* 306 U.S. 208, 59 S.Ct. 467 (1939); *Lamb Enterprises v. Toledo Blade Corp.,* 461 F.2d 506 (6th Cir.1972); *see also* Areeda & Turner, Antitrust Law, An Analysis of Antitrust Principles and Their Application, ¶ 626a.

Before assessing the anticompetitive effects of Mr. Calcutt's joint possession of controlling interests in the two banks, the court must determine the geographic area and the product markets within which these effects are relevant for section 1 purposes. The Supreme Court has given ample guidance for setting these parameters. *See U.S. v. Connecticut National Bank,* 418 U.S. 656, 94 S.Ct. 2788, 41 L.Ed.2d 1016 (1974); *U.S. v. Marine Bancorporation,* 418 U.S. 602, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974); *U.S. v. Phillipsburg National Bank,* 399 U.S. 350, 90 S.Ct. 2035, 26 L.Ed.2d 658 (1970); *U.S. v. Philadelphia National Bank,* 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963).[80]

## RELEVANT PRODUCT MARKET

■ The relevant product market is comprised of products that have reasonable "interchangeability" for the purpose for which they are produced. *United States v. E. I. DuPont de Nemours & Co.,* 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956). The essential test for ascertaining the relevant product market in-

---

**80.** Some of the cases cited herein were decided under provisions of the Clayton Act, 15 U.S.C. §§ 12–27 (1973), but nonetheless offer guidance to market delineation in Sherman Act claims.

*See United States v. Grinnell Corp.,* 384 U.S. 563, 572–73, 86 S.Ct. 1698, 1704–05, 16 L.Ed.2d 778 (1966).

volves the identification of those products or services that are either identical to or available substitutes for the defendants' product or service. *United States v. E.I. DuPont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); *White & White, Inc. v. American Hospital Supply Corp.*, 723 F.2d 495, 500 (6th Cir.1983).

■ It is the cluster of products and services that commercial banks offer that as an economic reality make commercial banking a distinct line of commerce for antitrust analysis. Commercial banks are the only financial institutions in which a wide variety of financial products and services—some unique, others not—are gathered in one place. The clustering of financial services in banks facilitates convenient access to them for all banking customers and limits the ability of other financial institutions to effectively compete. *United States v. Connecticut National Bank*, 418 U.S. 656, 94 S.Ct. 2788, 41 L.Ed.2d 1016 (1974); *United States v. Philadelphia National Bank*, 374 U.S. 321, 357, 83 S.Ct. 1715, 1737, 10 L.Ed.2d 915 (1963).

■ "Within a broad market, well-defined submarkets may, in themselves, constitute product markets for antitrust purposes ... the boundaries of such a submarket may be defined by examining such practical indicia of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962). However in selecting between two product markets, the Court must select that one which will reflect the full brunt of any and all anticompetitive effects of the challenged acquisition or merger. *United States v. Crowell, Collier & MacMillan, Inc.*, 361 F.Supp. 983, 1002 (S.D.N.Y.1973). This Court finds that the relevant product market in this case is the cluster of products and services offered by commercial banks.

■ In most cases determination of the relevant product market is a question of fact and the adoption of the appropriate delineation of the product market is a hotly contested issue. *See White & White, supra*, 723 F.2d at 500. The plaintiff bears the burden of proving the boundaries of the relevant market. *United States v. DuPont de Nemours*, 351 U.S. 377, 381, 76 S.Ct. 994, 999, 100 L.Ed. 1264 (1956).

The Government has proposed a very narrow definition. Specifically, it argues that the market should consist of the services it deems most significantly affected by Calcutt's acquisition of Central, transaction accounts and small business loans. Plaintiff further argues that the other services traditionally included in the "cluster of services" line of commerce traditionally adopted in banking have little or no impact on the majority of customers for which the defendant banks compete.

The defendants oppose the finding of such a narrow market and would expand the relevant product market to include the commercial banking industry. They contend that the acquisition should be assessed in terms of its affect on the entire line of services and products traditionally provided in smaller commercial banks.

A relevant market may not be defined by focusing on a single factor such as that proposed by the Government. *See George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 508 F.2d 547 (1st Cir.1974), *cert. denied*, 421 U.S. 1004, 98 S.Ct. 2407, 44 L.Ed.2d 673 (1975). While there may be within the market of commercial banking identifiable submarkets, "submarkets are not a basis for the disregard of a broader line of commerce that has economic significance." *United States v. Greater Buffalo Press*, 402 U.S. 549, 554, 91 S.Ct. 1692, 1695, 29 L.Ed.2d 170 (1971); *United States v. Phillipsburg National Bank & Trust Co.*, 399 U.S. 350, 360, 90 S.Ct. 2035, 2041, 26 L.Ed.2d 658 (1970). In selecting between two product markets, the Court must select that one which will reflect the full brunt of any and all anticompetitive effects of the challenged acquisition or

merger. *United States v. Crowell, Collier & MacMillan, Inc.*, 361 F.Supp. 983, 1002 (S.D.N.Y.1973).

The standard for delineation of the relevant product market in banking cases was established in *Philadelphia National Bank, supra.* The Court emphasized that it is the cluster of services that full service banks offer that as a matter of economic reality makes commercial banking a distinct line of commerce. 374 U.S. 321, 356–57, 83 S.Ct. 1715, 1737 (1963). This precedent has been followed in a long line of subsequent cases. *United States v. Connecticut National Bank*, 418 U.S. 656, 668, 94 S.Ct. 2788, 2796; *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 617, 94 S.Ct. 2856, 2868, 41 L.Ed.2d 978 (1974); *United States v. Phillipsburg National Bank*, 399 U.S. 350, 359–362, 90 S.Ct. 2035, 2041, 26 L.Ed.2d 658 (1970); *United States v. First National State Bancorporation*, 499 F.Supp. 793, 799–801 (D.N.J.1980).

There was no attempt made at trial to separate and identify each discrete product offered at each bank in the area. However, the vice-president of State Savings Bank, Irvin R. Cabot, did testify as to the products offered by State. These include deposit products, loan products, and bank services. The Government made no attempt to refute Mr. Cabot's testimony on this point or to show a substantial difference exists in the products offered by other banks. It is reasonable to infer that the products offered by State reflect the range of products available at other commercial banks in the area.[81]

■ The fact that the transaction accounts and small business loans are the services most affected by Calcutt's acquisition of Central is insufficient evidence for defining the relevant product market in such narrow terms. The focus is not on competition between the merging parties but is directed to the effect of the challenged acts on customers and all competing banks in the area. The Court declines to accept the narrow market proposed by the Government.[82] The Court finds that, as a matter of law, the relevant product market in this case includes the cluster of services and products that comprise the full range of services offered by commercial banks.

## RELEVANT GEOGRAPHIC AREA

■ The proper focus for defining a geographic market is to find that "area in which the seller operates, and to which the purchaser can practicably turn for supply." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 627, 5 L.Ed.2d 580 (1961); *White & White, Inc. v. American Hospital Supply Corp.*, 723 F.2d 495, 503 (6th Cir.1983); *U.S. v. Dairyman, Inc.*, 660 F.2d 192, 195 (6th Cir.1981).

In analyzing a proposed bank merger under section 7 of the Clayton Act, 15 U.S.C. § 18, the Supreme Court stated, "In banking, as in most service industries, convenience of location is essential to effective competition .... The factor of inconvenience localizes banking competition as effectively as high transportation costs in other industries." *Philadelphia National Bank, supra,* 374 U.S. at 359, 83 S.Ct. at 1738–1739. The inquiry into geographic market determinations is "not where the

---

**81.** The deposit products are: savings accounts, checking accounts, certificates of deposits, money market accounts, negotiable order of withdrawal (NOW) accounts, super NOW accounts and individual retirement accounts. The loan products are: mortgage loans, commercial loans, personal loans, auto loans and student loans. Bank services are: sale of cashier checks, sale of money orders, sale of traveler's checks, bank wire transfers, servicing of land contracts and favorable hours of operation.

**82.** The Government asserts that its product market analysis rests on the economic realities fundamental to an accurate definition of the product market. The Court is in complete agreement that savings and loan institutions as well as credit unions offer significant competition to commercial banks in some areas. However, testimony presented in this case is insufficient to disregard the fact that commercial banking remains, as a matter of law, a distinct line of commerce for purposes of antitrust analysis. *See United States v. Connecticut National Bank,* 418 U.S. at 663–65, 94 S.Ct. at 2793–94.

parties to the merger do business or even where they compete, but where, within the area of competitive overlap, the effect of the merger will be direct and immediate." *Id.*, at 357, 83 S.Ct. at 1738. Because the economic scale of separate categories of customers of bank services will vary, a workable compromise must be struck "to delineate the area in which bank customers that are neither very large nor very small find it practical to do their banking business ...." *Id*, at 361, 83 S.Ct. at 1740.

■■■ The Court concludes that the relevant geographic market in the case at bar consists of Benzie and Grand Traverse counties.

If it is assumed that State and Central no longer compete and that they operate as a unitary bank, their share of the total deposits in Benzie County would be 47.64%. In 1984, State had 24.46% of Benzie's total deposits, and Central had 22.18% of them. However, the Court is convinced that the banks in adjoining Grand Traverse County offer a convenient, practical alternative to Benzie residents, as well as a check on the extent to which Benzie banks could act in an anticompetitive manner without suffering a loss of patronage to Grand Traverse banks.

The record clearly reflects that Benzie residents gravitate to Grand Traverse County, and particularly to Traverse City in order to enjoy the advantages of the offerings typically available in a larger city; employment, shopping and cultural and social occasions. The record indicates to the Court that, while Benzie and Grand Traverse counties best approximate the "section of the country" in which to appraise any anticompetitive effect, the vast majority of interchange there occurs with Traverse City.

While Traverse City is a small city in its own right, it is apparent that it attracts the bulk of Benzie County's population on a regular basis. Traverse City is the hub of activity for Benzie residents: 17.2% of

them work there, many use the Traverse City grocery stores as their primary or secondary food stores. Between one-third and one-half of adult clothing bought by Benzie residents is bought in Traverse City stores. Although Traverse City is forty miles from Frankfort and thirty-two miles from Beulah, the record reflects that a significant portion of Benzie residents travel there regularly for the purpose of conducting routine personal affairs. It is not surprising, then, that 17.84% of the dollar value of *all* Benzie residents' accounts is held by Traverse City banks, and 18.72% of Benzie accounts is held by Grand Traverse banks.

In 1982, Benzie residents maintained $16,273,299.00 in Grand Traverse banks and savings and loans associations.[83] These deposits were maintained in 2,497 separate accounts and represents 4% of the total deposits in Grand Traverse banks. Excluding the $3,934,838.00 in deposits held by Benzie residents in Grand Traverse savings and loans, the total Benzie deposits in Grand Traverse commercial banks is $12,338,461.00.

The Court notes that while the deposits held in Grand Traverse savings and loans are not relevant to market definition, they are relevant to show how convenient it is for Benzie residents to conduct "banking" business in Grand Traverse.

The Court rejects the defendant's contention that the relevant geographic market is the five county area including Kalkaska, Leelanau and Antrim counties, in addition to Benzie and Grand Traverse. The uncontradicted evidence in the record reflects that only 5.05% of the total deposits of Benzie residents in 1982 is placed in banks outside Benzie and Grand Traverse counties.[84] This percentage represents $1,226,380 held by three banks and one savings and loan in the three other counties. It also represents deposits held by Security National Bank of Manistee, in the amount

---

83. Defendants' exhibit BB.

84. This percentage is derived from defendants' exhibit X, representing all deposits by Benzie residents in 1982.

of $921,150.00. Security National is in Manistee County, which borders Benzie County to the south and is not within the five county market.

While the Court recognizes that Benzie residents maintain accounts in institutions outside of the two county area, it perceives its task to find "some fair intermediate delineation which avoids the indefensible extremes." *Philadelphia National Bank, supra* 374 U.S. at 361, 83 S.Ct. at 1740.

So, while these banks do offer some alternatives to Benzie customers, they are in no way as substantial a substitute as the Grand Traverse banks.[85] The commercial realities of the region are such that Benzie residents may practicably turn to Grand Traverse banks for banking services.[86]

## ANTICOMPETITIVE EFFECTS

Having determined that the cluster of banking products and services is the relevant product market and that Benzie and Grand Traverse counties are the relevant geographic areas, the Court must determine whether Mr. Calcutt's joint control imposes an unreasonable restraint of trade within these relevant markets.

In a case brought under § 7 of the Clayton Act, 15 U.S.C. § 18, the Supreme Court stated:

... we think that a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects. *Philadelphia National Bank, supra,* 374 U.S. at 363, 83 S.Ct. at 1741.

The emphasis on market concentration in § 7 cases is relevant to cases brought under § 1; the court in the *Philadelphia National Bank* case was merely adopting the "general agreement" that "... beyond some point the smaller the number of firms and the larger the share of the market occupied by one or relatively few firms, the greater the likelihood of substantial departure from competitive performance, particularly with regard to price." Areeda & Turner, *supra* Antitrust Law, ¶ 910b.

The parties in the case at bar recognize the importance of market concentration in the competitiveness analysis. The Court now having defined the markets, it is clear that the increase in market concentration caused—even if we assume Central and State now operate, or will operate, as a unitary bank—will be economically insignificant.

---

**85.** The defendants also rely on the geographic market definition proposed by the Federal Reserve Bank of Chicago. *See* Allerdice, A Guide to Banking Markets in the Seventh Federal Reserve District (1980: Federal Reserve Bank of Chicago). In the Guide, Mr. Allerdice concludes that the relevant geographic market for the region at issue in the case at bar is the five county area. There is no basis given as to this conclusion, other than that "... the markets listed herein represent the product of an amalgamation of various techniques adopted across hundreds of cases during more than a quarter of a century." *Id.,* at p. vii.

Noting that several cases have adopted the findings of federal agencies on this point where appropriate, *see, e.g. Phillipsburg National Bank, supra,* 399 U.S. at 364, 90 S.Ct. at 2044; *Philadelphia National Bank, supra* 374 U.S. at 361, 83 S.Ct. at 1740, this court deems such findings inappropriate here.

**86.** Although the commercial realities may differ greatly from region to region, regardless of its

size, the residents of rural Benzie County do not appear, based on their level of interchange with Grand Traverse, to be deterred by the driving distance of 35–40 miles.

In passing on a merger between banks located in Powell and Cody, Wyoming, the Tenth Circuit stated, " 'The factor of inconvenience localizes banking competition as effectively as high transportation costs in other industries.' (citations omitted) However, what may be inconvenient to a bank customer in an urban area, who has many alternatives for banking and other services in the immediate vicinity, may not be inconvenient to a customer in a small, rural town who is accustomed to traveling long distances to obtain basic services." *Wyoming Bancorporation v. Federal Reserve Board,* 729 F.2d 687, 690 (10th Cir.1984).

The present case bears this out. The extent to which banking is localized is not absolute, but is dependent on the characteristics of each region.

Under the 1982 U.S. Department of Justice Merger Guidelines, an internal agency publication which appears to set rough guides as to when the Department will challenge mergers, the two county market would be considered highly concentrated. The four largest banks have a combined market share of 79.75%.[87] The guidelines, however, reflect a preference for using the Herfindahl-Hirschman Index ("HHI") to gauge the dangerousness of concentration levels.[88] Under the Guidelines, a market with an HHI of about 1800 is defined as being highly concentrated. The HHI in the relevant market in this case is 2161.

Under the Department's Guidelines, "Additional concentration in a highly concentrated market resulting from mergers is a matter of significant competitive concern, and the Department will resolve close questions in favor of challenging the merger. The Department is unlikely, however, to challenge mergers producing an increase in the HHI of less than 50 points." (footnote omitted) The increase in the HHI, if we assume Central and State operate unitarily, is 21 points.[89]

Therefore, it is clear that even under the standards established by the Department's Antitrust Division, and under the assumption that the banks no longer compete, Mr. Calcutt's joint control of Central and State is not unreasonably anticompetitive. The four leading banks in the market had nearly 80% of the market share of total deposits in 1983. Central had 3.08% of total deposits. State had 3.26% of total deposits.

■ Market concentration and market shares, standing alone, are insufficient tests for anticompetitive effects. *U.S. v. First National State Bancorporation*, 499 F.Supp. 793, 805 (D.N.J.1980); Areeda & Turner, *supra* ¶ 913b. But the other evidence of market competition after 1979

support the finding that Mr. Calcutt's control is not anticompetitive.

In 1979 there were four banks in Benzie County with five banking offices. In 1984, there were five banks with seven offices. Benzie National formed in Frankfort in 1983. Michigan National Bank's Benzonia branch, which opened in 1975, increased its market share of the Benzie County market from 3.09% in 1977 to 12.41% in 1983. Three of the largest holding companies in Michigan have banks in Traverse City. One of them, Old Kent, acquired Pacesetter's Traverse City banks in 1984.

This evidence reflects that the competitiveness is healthy even within Benzie County. Additionally, both Central and State have lost ground in terms of market share since 1979. Moreover, Dr. Horvitz, the Government's economics expert testified that there is no evidence of any price effects resulting from Mr. Calcutt's influence over both banks.

The Government has also attempted to show that Mr. Calcutt has acted anticompetitively by dropping Central's proposal to branch into Elberta, decreasing solicitation of Frankfort business, and by cancelling its membership in Frankfort's Chamber of Commerce. As the Court has found as matters of fact, any inconvenience or harm to its customers caused by this conduct is minimal. Implicit is the Court's determination of the relevant geographic area is the finding that any customer harmed by these, or other measures taken by State or Central, could practicably turn to other Benzie or Grand Traverse banks.

## CONCLUSION

■ Accordingly, the Court concludes that Mr. Calcutt's possession of controlling interests in State Savings Bank and Central State Bank does not violate section 1 of

---

**87.** This figure was compiled by the court, using defendant's exhibit DDD (Grand Traverse and Benzie market shares), but subtracting the deposits held by savings and loans. The total deposits in this two county market for commercial banking is $465,696,000.00.

**88.** The HHI for a market is calculated by summing the squares of the market share of each market participant. *See* Areeda & Turner, *supra* at ¶ 913a2.

**89.** Based on defendants' exhibit DDD, the increase in the HHI is from 2161 to 2182.

the Sherman Act. Therefore judgment shall be entered in favor of all defendants.